UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:19-cr-00187-JAW-1 |
| | ) | |
| RAYEVON DESCHAMBAULT | ) | |

## ORDER ON MOTION FOR *FRANKS* HEARING AND MOTIONS TO SUPPRESS

The Court denies a defendant's request for a *Franks* hearing and motion to suppress evidence.  Here, while law enforcement was searching a defendant's cellphone for evidence of drug dealing pursuant a search warrant, they came upon two videos of the defendant engaged in sexual relations with a female later confirmed to be fourteen years old.  The Court concludes that these facts do not merit either suppression of the video evidence or a *Franks* hearing.

## I.    BACKGROUND

On October 11, 2019, a federal grand jury indicted Rayevon Deschambault on two counts of sexual exploitation of a child, alleged violations of 18 U.S.C. § 2251(a). *Indictment* (ECF No. 1).   On February 21, 2020, Mr. Deschambault filed three motions to suppress; the last motion to suppress included a request for a *Franks*[1] hearing.  *Mot. to Suppress* (ECF No. 40) (*Def.'s First Mot.*); *Mot. to Suppress II* (ECF No. 41) (*Def.'s Second Mot.*); *Mot. to Suppress and Req. for* Franks *Hr'g* (ECF No. 42) (*Def.'s Third Mot.*).  The Government filed a consolidated response to these motions on April 27, 2020. *Gov't's Resp. to Def.'s Mots. to Suppress and Req. for a Franks Hr'g*

---

[1]     *Franks v. Delaware*, 438 U.S. 154 (1977).

(ECF No. 49) (*Gov't's Opp'n*).  Mr. Deschambault filed replies on May 11, 2020.  *Reply Re: Mot. to Suppress* (ECF No. 51) (*Def.'s First Reply*); *Reply Re: Mot. to Suppress and Req. for Franks Hr'g* (ECF No. 52) (*Def.'s Third Reply*).

After reviewing the initial filings, the Court ordered the parties to address by supplemental memoranda an issue not addressed by the parties' original filings: whether the plain view doctrine applies to the facts in this case and, if so, what impact the application of the doctrine would have on Mr. Deschambault's motions. *Order for Further Briefing* (ECF No. 55).  The Court ordered simultaneous memoranda and simultaneous responses, eliminating the added delay from replies. *Id.* at 6.  The Government and Mr. Deschambault filed supplemental memoranda on August 3, 2020, *Gov't's Br. on the Applicability of the Plain View Doctrine* (ECF No. 56) (*Gov't's Supp. Mem.*); *Supp. Mem. Re: Mots. to Suppress* (ECF No. 57) (*Def.'s Supp. Mem.*), and responses on August 10, 2020. *Gov't's Mem. in Resp. to Def.'s Br.* (ECF No. 58) (*Gov't's Supp. Resp.*); *Resp. Re: Plan View/Mots. to Suppress* (ECF No. 59) (*Def.'s Supp. Resp.*).

## II.    FACTUAL BACKGROUND[2]

### A.    Background Events Leading to the Arrest Warrant for Rayevon Deschambault and the August 20, 2019 Motor Vehicle Stop

On June 19, 2019, the Maine Drug Enforcement Agency (MDEA) conducted a controlled purchase by a confidential informant (CI) of $50 of cocaine base from Rayevon Deschambault. *Gov't's Opp'n* at 1. On June 19, 2019, the CI sent Mr. Deschambault several text messages before buying approximately one-half gram of cocaine base. *Id.* On August 16, 2019, the MDEA conducted a second controlled purchase by the same CI from Mr. Deschambault of $120 worth of cocaine base. *Id.* The CI and Mr. Deschambault again exchanged text messages before they met briefly, and the CI bought 1.4 grams of cocaine base from Mr. Deschambault. *Id.*

---

[2]     The Court sets forth this statement of facts based primarily on the contents of the documents that the parties have supplied, the search warrant affidavits, the search warrant orders, and the investigative reports. For some background information, the Court had to rely on the memoranda of counsel, particularly counsel for the Government, because the Government did not supply investigative reports corroborating its factual assertions. Thus, for example, the Court assumed the accuracy of the Government's background of the confidential informant's dealings with Mr. Deschambault leading to the issuance of the arrest warrant and the police stop of the motor vehicle on August 20, 2019. In his response, Mr. Deschambault did not contest the accuracy of that background information and although it is not corroborated, it provides context for what happened at the stop and thereafter.

     For purposes of resolving the pending motions, the critical factual background about the original state warrant, the search of the Deschambault apartment, the discovery of the three videos on the iPhone, the affidavit in support of the federal warrant, and the magistrate judge order approving the search of the iPhone for evidence of sexual exploitation of children, is a matter of record and the Court relied on the documents in setting forth the facts.

     The Court's recitation of facts differs in some respects from what counsel, particularly defense counsel, represented in their memoranda. If the Court accepted whatever counsel has represented in their memoranda over what appears in the record, the Court might accept argument as fact. If, after reviewing the Court's recitation of the facts, defense counsel concludes that the Court erred in its factual findings, defense counsel is free to file an appropriate motion with documentary support, bringing the factual error to the Court's attention so that the Court can evaluate whether defense counsel's version is supported by the record and whether a reevaluation of the merits of the motion is in order.

Based on this information, the MDEA obtained an arrest warrant for Mr. Deschambault from a state magistrate.  *Id.*

On August 20, 2019, the MDEA facilitated a third controlled purchase by the CI of two grams of cocaine base from Mr. Deschambault.  *Id.*  The meeting place was to be at Anania's Variety Store on Washington Avenue in Portland, Maine.  *Id.* Agents went to Mr. Deschambault's residence in Westbrook, Maine and observed Mr. Deschambault go inside.  *Id.*  Shortly thereafter, agents observed Zilphy Avery, a co-defendant, leave the residence and get into the driver's side of a motor vehicle and Mr. Deschambault get into the passenger's seat.  *Id.* at 2.  Ms. Avery then drove the two toward Washington Avenue.  *Id.*  Law enforcement stopped the motor vehicle. *Id.*  At the time of the stop, Ms. Avery was driving and Mr. Deschambault was in the passenger's seat.  *Id.*

## B. The August 20, 2019 Motor Vehicle Stop

During the motor vehicle stop, law enforcement detained Ms. Avery and searched the vehicle.  *Gov't's Opp'n* at 2.  The search proved fruitful.  *Id.*  Law enforcement found a black gym bag which contained a loaded silver handgun, a digital scale with cocaine residue, and cellophane bags with the corners cut.  *Id*.  The bag was located under Mr. Deschambault's seat, accessible from the back seat.  *Id.* Mr. Deschambault denied any knowledge of the gun and Ms. Avery claimed that it belonged to her.  *Id.*

In addition to the black gym bag and its contents, law enforcement seized two cellphones found inside the vehicle.  *Def.'s Second Mot.*, Attach. 1, *Affidavit of Special*

4

*Agent Austin Clark of the Maine Drug Enforcement Agency* at 3 (*Clark Aff.*). The first phone was a silver and black iPhone S bearing IMEI 354957075834401. *Id.* Officers found this phone under the front passenger seat, where Mr. Deschambault had been sitting. *Id.* MDEA Special Agent Robinson called the phone number for Mr. Deschambault that the CI had used to set up the controlled purchases described above. *Id.* When Special Agent Robinson did this, the iPhone rang and displayed Special Agent Robinson's phone number on the caller I.D. *Id.* The second phone that officers found in the car was located on the driver's seat, where Ms. Avery had been sitting. *Id.* This phone was a black Samsung Galaxy J3, which bore IMEI number 235069106111981. *Id.* Law enforcement observed that phone displayed a message which identified the phone's owner as "Zilphy." *Id.*

A canine unit arrived at the scene and alerted to the presence of drugs on Ms. Avery. *Gov't's Opp'n* at 2. Ms. Avery then produced a tied cellophane bag that contained two smaller cellophane bags, the total weight of which was 5.8 grams. *Id.* MDEA Special Agent Austin Clark conducted a field test on the substance inside the bags using a Narco pouch test kit. *Clark Aff.* at 3. The Narco pouch test identified the substance as a presumptive positive for cocaine base. *Id.* Ms. Avery declined to make any statement about the drugs. *Gov't's Opp'n* at 2.

Subsequent execution of a search warrant for Mr. Deschambault's residence revealed a cellophane bag with approximately 26.4 grams of cocaine base in a purse in Mr. Deschambault's bedroom. *Id.* Law enforcement found one thousand five hundred and twenty-five dollars in Mr. Deschambault's dresser. *Id.* The searching

5

officers located an additional .23 grams of cocaine base in the trash and a small bag with .77 grams of cocaine. *Id.* Law enforcement found other drug-related paraphernalia, including a digital scale, baggies and baking soda. *Id.*

### C. The September 4, 2019 Affidavit and Search Warrant Application by MDEA Special Agent (SA) Austin Clark

On September 4, 2019, Agent Clark obtained a warrant from state of Maine District Court Judge E. Mary Kelly to search the iPhone that law enforcement seized when they stopped Mr. Deschambault and Ms. Avery. *Def.'s Mot.*, Attach. 2, *In re Search Warrant for the Portable Electronic Device and Data Seized From Rayevon Deschambault* (*State Search Warrant*). That warrant authorized law enforcement to search and seize "[r]ecords documents or data" contained within the iPhone which "[p]ertain to Rayevon Deschambault's use of the portable electronic device to engage in the crime of Aggravated Trafficking in Schedule W Drugs" or that "[d]emonstrate ownership, possession or use" of the iPhone "or that identify the owner, possessor or user." *Id.* at 2. Further, the warrant provided that any digital evidence that was seized may be copied, analyzed, or examined by law enforcement agents after law enforcement executed the warrant. *Id.*

### D. The Actions of FBI Task Force Officer Daniel Townsend Between September 18, 2019 and September 23, 2019

A search of the seized iPhone S revealed more than just the anticipated evidence of Mr. Deschambault's drug trafficking. On September 18, 2019 Agent Clark conferred with Federal Bureau of Investigation (FBI) Task Force Officer (TFO) Daniel Townsend regarding digital information that MDEA agents had extracted

from the iPhone.  *Def.'s Third Mot.,* Attach. 2, *Review of Phone Extraction by TFO Daniel Townsend* at 1 (*Sept. 20, 2019 Investigative Report*).  Agent Clark displayed a copy of the digital extraction for Officer Townsend while the pair were gathered at the MDEA Cumberland Task Force Office in Portland, Maine.  *Id.*  As Agent Clark explained to Officer Townsend, law enforcement had discovered several sexually explicit videos while searching the phone.  *Id.*

Officer Townsend and Agent Clark reviewed three videos found on the iPhone. *Id.*  Two of the videos depicted a female engaging in several sex acts with a male holding the phone.  *Id.*  Officers observed that the male had distinct tattoos on his arms and hands that were visible during various portions of the videos.  *Id.* at 1-2.  A third video showed the female from the first two videos alongside a woman Agent Clark identified as Zilphy Avery.  *Id.* at 1-2.  Agent Clark provided Officer Townsend with a USB drive of the videos and Officer Townsend used his government-issued phone to take a clothed picture of the unidentified female with the intent of identifying her.  *Id.* at 2.  Upon further review of the videos, Officer Townsend noticed that the bedding and wall paneling were similar in all three videos.  *Id.*

Later that day, Officer Townsend began work on trying to identify the unknown female in the three videos.  *Def.'s Third. Mot.*, Attach. 3, *Child Victim and Child Witness Identity Info.* at 1-2 (*Sept. 23, 2019 Investigative Report*).  Because the MDEA had received information that a young female from a community in the Portland area was involved with Rayevon Deschambault's drug distribution activity, Officer Townsend contacted the police department for that town for help identifying

7

the female.  *Id.* at 1.  A clothed photograph of the female was distributed to school resource officers (SRO) within the district who identified her as a fourteen-year-old. *Id.* at 1-2.  The SRO identified the female's mother and the location of the family's residence.  *Id.*

Officer Townsend spoke with their alleged minor female victim and her mother at their residence later that day.  *Def.'s Third Mot.*, Attach. 5, *Child Victim and Child Witness Identity Info.*at 1 (*Second Sept. 23, 2019 Investigative Report*).  Before the interview, Officer Townsend spoke with the minor female's mother to explain that the interview was part of an ongoing investigation into possible exploitation of her daughter.  *Id.*  Officer Townsend then interviewed the minor female regarding her knowledge of a woman named Zilphy.  *Id.* 2.  The female confirmed she knew Zilphy, had met her online, and had spent time with her over the summer.  *Id.*  She further indicated that Zilphy's boyfriend was called "Minolo", but that she did not know the boyfriend's real name.  *Id.*  The minor female also was aware that Zilphy and "Minolo" sold cocaine.  *Id.*  She stated that on one occasion they asked her to assist their distribution and offered her cocaine, but that she declined.  *Id.*

On September 23, 2019 Officer Townsend again reviewed the videos derived from SA Clark's extraction.  *Def.'s Third Mot.*, Attach. 6, *Townsend Mem. Dated Sept. 24, 2019* (*Townsend Mem.*).  TFO Townsend captured five screenshots for possible inclusion in an affidavit for a search warrant of the iPhone.  *Id.*

### E.      The September 24, 2020 Search Warrant Application by TFO Daniel Townsend and its Execution

On September 24, 2019, Officer Townsend applied to a federal magistrate judge for a search warrant to search Mr. Deschambault's cell phone.  *Def.'s Third Mot.*, Attach. 1, *Fed. Search Warrant App.*  In his supporting affidavit, Officer Townsend wrote:

> 7.      During the course of executing a search warrant authorized by Maine District Judge E. Mary Kelly on September 4, 2019, which permitted a search of the Target Phone for evidence related to drug crimes, I observed a video which depicted genital-genital contact between Rayevon Deschambault and Victim one.  I observed a second video which showed oral-genital contact between Rayevon Deschambault and Victim One.  Stills from those two videos are attached as exhibits.

> 8.      The video depicting genital-genital contact was dated August 14, 2019 and the video depicting oral-genital contact was dated August 13, 2019.

> 9.      I identified Rayevon Deschambault as participating in the sexually explicit conduct because of his distinctive arm- and hand tattoos that are visibile in the video during the contact.  I have compared them to photographs taken by the Cumberland County Sheriff's Office in Portland, Maine during Rayevon Deschambault's arrest processing and concluded that the tattoos visible in the photographs are the same ones visible in the video.  Additionally, Maine Drug Enforcement Agency Special Agent ("SA") Austin Clark has reviewed the videos.  SA Clark confirmed to me that the location shown in the video was the same room that SA Clark and other officers searched pursuant to a separate search warrant for Rayevon Deschambault's bedroom . . ..  According to arrest records I have reviewed, Rayevon Deschambault is 25 years old but was 24 at the timestamps of the videos on August 13 and 14, 2019.

> 10.    Victim 1 is a person known to me.  Her face is clearly shown on
> the videos during the course of the sexually explicit conduct described
> above.  She is fourteen years old, having been born during the month of
> December 2004.  I confirmed her date of birth with her mother, who is
> another person known to me.  I further confirmed her date of birth was
> a custodian of records at her high school.

*Id*. at 4-5.

After stating the above, Officer Townsend described his training and experience with electronic storage and analysis.  *Id*. at 5.  Specifically, he stated that "electronic devices can store information for long periods of time" and that "things that have been viewed via the Internet are typically stored for some period of time on the device."  *Id*.  Therefore, Officer Townsend stated: "There is probable cause to believe that things that were once stored on the laptop may still be stored there. . .".  *Id*.  Officer Townsend further stated that "Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person 'deletes' a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data."  *Id*.

The magistrate judge granted Officer Townsend's application for a search warrant.  *Id*. at 1.  On October 11, 2019, a federal grand jury indicted Rayevon Deschambault on two courts of the sexual exploitation of a child, alleged violations of 18 U.S.C. § 2251(a).  *Indictment* (ECF No. 1).  Now, Mr. Deschambault has moved to suppress the evidence obtained from the second warranted search of the iPhone.

*Def.'s First Mot.*; *Def.'s Second Mot.*; *Def.'s Third Mot.*  His third motion to suppress

included a request for a *Franks* hearing.  *Def.'s Third Mot.*

## III.   THE PARTIES' POSITIONS

### A.   Rayevon Deschambault's Motions

#### 1.   The First Motion to Suppress

Alleging that law enforcement performed an illegal warrantless search of his

cellphone in violation of the Fourth Amendment of the United States Constitution,

Mr. Deschambault moves this Court to suppress the images and videos that law

enforcement obtained while reviewing the iPhone's contents before obtaining a

federal warrant.  *Def.'s First Mot.* at 1.  Mr. Deschambault also requests that the

Court schedule an evidentiary hearing to resolve this issue.  *Id.*  Citing *Riley v.*

*California*, 573 U.S. 373 (2014), Mr. Deschambault observes that the United States

Supreme Court held that cellphones may not be searched unless law enforcement

obtains a search warrant.  *Id.* at 2-3.  He notes that in *Carpenter v. United States*,

138 S. Ct. 2206 (2018), the United States Supreme Court extended *Riley* to cellphone

towers.  *Id.* at 3.  Mr. Deschambault says that the state warrant limited the cellphone

search to evidence of drug trafficking, but the FBI Agent extensively examined the

cellphone for evidence of another crime beyond the terms of the state warrant.  *Id.*

Mr. Deschambault contends that this search violated the Fourth Amendment and the

results of the search must be suppressed.  *Id.*

11

### 2.     The Second Motion to Suppress

In his second motion to suppress, Mr. Deschambault again refers to *Riley* and *Carpenter* for the proposition that the United States Supreme Court has ruled that cellphones are protected by the Fourth Amendment and that the search warrant requirement applies to law enforcement's search of his cellphone. *Def.'s Second Mot.* at 2.   Mr. Deschambault argues that Agent Clark's affidavit did not tie Mr. Deschambault to the property to be searched and therefore, in his view, was "legally insufficient in probable cause." *Id.* Mr. Deschambault states that "there could be no Good Faith reliance upon this warrant." *Id.*   He claims that the warrant was "so deficient" that "apparently at the Magistrate's urging, a handwritten paragraph 16 was added to the affidavit trying to connect the phone to the Defendant."[3]  *Id.*  Mr. Deschambault argues that despite this additional paragraph, "there is no reliable or conclusive evidence offered establishing Defendant's ownership of this phone sufficient to establish probable cause." *Id.*

### 3.     The Third Motion to Suppress and Request for *Franks* Hearing

Mr. Deschambault's third motion to suppress alleges that the Court should suppress the results of the search of the cellphone performed pursuant to the search warrant because the affidavit supporting the request for the search warrant contained "material false and misleading statements as well as omissions which, if

---

[3]     The Court reviewed Agent Clark's supporting affidavit and all the other attachments to the Defendant's filings.  Despite its search, the Court could not locate the alleged handwritten paragraph 16.  If Mr. Deschambault and his counsel locate and submit the paragraph in question, the Court will review it and make any necessary amendments to this Order.

excised from the affidavit for the warrant, would leave said warrant fatally defective in probable cause." *Def.'s Third Mot.* at 1.

Mr. Deschambault writes that in the affidavit, Agent Townsend stated that "in the course of executing" a State search warrant, "I observed" video depictions of Defendant engaged in sexual activities with "Victim One." *Id.* "In actuality," Mr. Deschambault states, "the Search warrant had been fully executed prior to any involvement of Agent Townsend, and therefore his statements that the sexual videos were observed by himself during the execution of the State warrant [were] false." *Id.* Mr. Deschambault writes that "[i]t cannot ever be persuasively advanced that Townsend was part of a further execution of the State warrant, since as soon as the search ceased to be focused on evidence of drug trafficking and began to be focused on sexual offenses the search was outside any legal parameters of the State warrant." *Id.*

Mr. Deschambault argues that "[m]ore critically," Agent Townsend's sworn statement that "Victim 1 is a person known to me" conveys the assertion that when Agent Townsend viewed the video, he recognized the minor victim. *Id.* at 3. Mr. Deschambault contends that this statement is "so seriously misleading that an intent can be presumed to mislead the Magistrate Judge." *Id.* In fact, Mr. Deschambault states, Agent Townsend did not recognize the minor victim when he viewed the video. *Id.* Mr. Deschambault says the same applies to Agent Townsend's statement in his affidavit that he recognized the mother of the victim. *Id.* Mr. Deschambault says that Agent Townsend omitted from his search warrant affidavit the numerous steps

he took to identify the victim and the mother. *Id.* Had Agent Townsend supplied this information, Mr. Deschambault states that the Magistrate Judge may have asked the following question:

> You have already searched the videos, and you have already used the fruits of those searches to conduct further investigation establishing the girl's identity and age, what more do you need a search warrant for?

*Id.*

Citing *Riley, Carpenter*, and *Franks*, Mr. Deschambault requests that the Court convene a *Franks* hearing because in his view the search warrant affidavit contained false and misleading statements that led to the issuance of the search warrant in violation of the Fourth Amendment. *Id.* at 4. At the same time, Mr. Deschambault contends that the Court has enough evidence to decide the motion to suppress in his favor on the basis of the evidence already submitted. *Id.* He argues that once the misleading and omitted statements are struck, the remainder of the search warrant would not have justified its issuance. *Id.*

### B.  The Government's Consolidated Opposition

#### 1.  The First Motion to Suppress

The Government disputes the premise of Mr. Deschambault's argument: namely, his contention that the state warrant did not allow for the search that led to the discovery of the video of sexual activity. *Gov't's Opp'n* at 4. To the contrary, the Government says that the state search warrant expressly allowed the search of an identified iPhone and "any data stored therein." *Id.* The Government says that the warrant expressly allowed the seizure of evidence related to drug trafficking. *Id.*

According to the Government, the warrant went on to allow the search of the cellphone for "[r]ecords, documents, or data contained in portable electronic devices . . . including but not limited to graphic visual images (such as photographs, videos, and scanned images)" that related to two different areas: drug trafficking and evidence that "could demonstrate ownership, possession or use of the phone, or the data contained therein, or that identify the owner, possessor or user." *Id.*

Here, the Government defends the breadth of search warrant as "reasonable" for a court to authorize, given the amount and variety of electronic data that can be stored on a cellphone. *Id.* The Government also notes that the images of Mr. Deschambault discovered on the video identified him by his distinctive tattoos as the owner, possessor or user of the cellphone and were taken from the angle of the possessor and showed the bedroom that the Government had searched and were able to identify as his. *Id.*

### 2. The Second Motion to Suppress

The Government next responds to Mr. Deschambault's second motion to suppress, which is based on Mr. Deschambault's assertion that the evidence did not sufficiently tie him to the cellphone to provide probable cause for the search and seizure of the cellphone. *Id.* at 5. The Government disagrees again with Mr. Deschambault's factual premise and points to several facts that it claims provided probable cause to believe that Mr. Deschambault was tied to the cellphone: (1) the cellphone was under the seat where Mr. Deschambault was sitting, (2) Agent Robinson called the cellphone number that the CI had been using to contact Mr.

Deschambault and the iPhone rang as Agent Robinson's caller I.D. appeared on the iPhone screen, and (3) the CI had made arrangements to purchase $120 worth of crack cocaine from Mr. Deschambault using the iPhone found underneath Mr. Deschambault's seat connects the iPhone to drug trafficking. *Id.* Finally, the Government observes that the other cellphone in the vehicle was connected not to Mr. Deschambault but to his girlfriend, Zilphy Avery, making it more likely that the iPhone was connected to Mr. Deschambault. *Id.*

### 3. The Third Motion to Suppress and Request for *Franks* Hearing

Finally, the Government responds to Mr. Deschambault's third motion to suppress and his request for a *Franks* hearing. *Id.* at 5-6. The Government lists five misstatements or omissions that Mr. Deschambault claims appeared in the affidavit for the search warrant of Mr. Deschambault's cellphone: (1) Agent Townsend's statement that he observed the videos "during the course of" his examination of the iPhone pursuant to the state search warrant; (2) his naming the minor in the video a "victim" before he knew her age; (3) his statement that Victim 1 "is known to me;" (4) his statement that he also knew the victim's mother, and (5) his omission of certain investigative steps to determine the identity of the victim and her mother. *Id.* at 6.

After reviewing the applicable law, the Government argues that Mr. Deschambault is not entitled to a *Franks* hearing because the Townsend affidavit, in the Government's view, did not include "a false statement or omission. . . that was made knowingly and intentionally or with a reckless disregard for the truth." *Id.* at 8 (quoting *United States v. Rigaud*, 684 F.3d 169, 173 (1st Cir. 2012)). In addition,

16

the Government contends that any inaccuracies were minor and did not affect the determination of probable cause. *Id.*

### C.   Rayevon Deschambault's Replies

#### 1.   Reply to the First Opposition

In his Reply to the Government's first response, Mr. Deschambault concedes that the executing officers could "view the videos and use them to ferret out evidence of drug trafficking." *Def.'s First Reply* at 1.  Mr. Deschambault contends instead that the legality of the search and seizure of the cellphone "does not then legally justify additional searches conducted by a Federal Agent seeking evidence of illegal sexual activity." *Id.*  Mr. Deschambault rejects the Government's explanation that it could search the cellphone to determine the identity of the owner, possessor or user, noting that the Government argued in response to the second motion to suppress that it had sufficient evidence that Mr. Deschambault was the owner, possessor or user to establish probable cause for the search. *Id.*  Mr. Deschambault argues that if the Government's broad view of its searching authority were accepted, the search warrant would become a general warrant and violate the particularity requirement of the Fourth Amendment. *Id.* at 2.

#### 2.   Reply to the Second Opposition

Mr. Deschambault did not file a reply to the Government's response to his second motion to suppress.

#### 3.   Reply to the Third Opposition

In his Reply to the Government's response to his third motion, Mr. Deschambault says that the Government "misapprehends the Defendant's argument concerning what actions the Agent engaged in prior to securing the warrant and which were not disclosed to Magistrate [Judge] Rich." *Def.'s Third Reply* at 1. It was not, as the Government proposed, a "catalogue of all investigative steps taken to establish probable cause." *Id.* (quoting *Gov't's Opp'n* at 5). Instead, Mr. Deschambault explains that "all the investigation and searching which the warrant could be expected to authorize had already taken place without the warrant." *Id.* Furthermore, Mr. Deschambault argues that the Agent "phrased statements the way he did to actively conceal that all the searching that the warrant was designed to allow had already taken place." *Id.* He argues that if the Magistrate Judge had known about the prior search, he would not have issued the federal warrant and the Government "would no longer be able to use the existence of the Federal Warrant as cover for the illegal actions of its agent prior to the issuance of the Federal Warrant." *Id.* at 2.

### D.   The Supplemental Memoranda

#### 1.   The Government's Supplemental Memorandum

In its supplemental memorandum, the Government argues that the plain view doctrine applies to the search in this case. *Gov't's Supp. Mem.* at 1. The Government argues that law enforcement's discovery of the videotape of the sexual activity in Mr. Deschambault's cellphone meets the three-prong standards under the plain view doctrine that the Supreme Court articulated in *Horton v. California*, 496 U.S. 128

(1990) and *Coolidge v. New Hampshire*, 403 U.S. 443 (1971). *Id.* at 2 (quoting *Horton*, 496 U.S. at 136-37 and *Coolidge*, 403 U.S. at 465). The Government argues that the officer was lawfully in a place where the object could be plainly seen, that the incriminating character of the object was readily apparent, and that the officer could lawfully access the object itself. *Id.*

### 2. Rayevon Deschambault's Supplemental Memorandum

In his supplemental memorandum, Mr. Deschambault contends that the Government failed to meet the second prong of the *Horton* analysis: namely he says that incriminating character of the evidence was not readily apparent. *Def.'s Supp. Mem.* at 1. Mr. Deschambault argues that the opposite is true:

> [T]here was no apparent illegality whatsoever. The video images seen by the initial officer were of a developed, fully-mature sexually-experienced female engaged in clearly consensual sexual activities.

*Id.* He points out that the officer could not immediately obtain a warrant based on the contents of the video alone but had to engage in an investigation to determine the identity and age of the female. *Id.*

### 3. The Government's Supplemental Response

The Government responds that *Horton* does not require that law enforcement witness "apparent illegality," the phrase used in Mr. Deschambault's memorandum. *Gov't's Supp. Mem.* at 1. Instead, the Government says that the *Horton* standard is whether it is readily apparent that the object has an "incriminating character." *Id.* The Government notes that the "incriminating character" of the video for purpose of the drug trafficking investigation is readily apparent because it identifies Mr.

Deschambault and links him to the cellphone. *Id.* at 1-2. For purposes of the current charge of sexual exploitation of a child, the Government contends that it was sufficiently apparent to the investigators to lead them to determine her age and identity. *Id.* at 2.

### 4.    Raveyon Deschambault's Supplemental Response

Mr. Deschambault maintains that once the Government viewed the video of sexual activity and could not determine whether the female was a child, it should have terminated its investigation of the possible child exploitation crime and, if they had probable cause to believe that Mr. Deschambault had committed a crime separate from drug trafficking, law enforcement should have sought a search warrant to further investigate that possible crime. *Def.'s Supp. Mem.* at 1. Mr. Deschambault points out that the investigators came upon two videos of sexual activity with the person they have now identified as a minor, but in writing the report, the investigator failed to make any reference to the concern that she might have been a minor. *Id.* at 2-3.

## IV.   DISCUSSION

### A.    The Search Incident to Warrant

As described, all three videos which are the subject of Mr. Deschambault's motions to suppress are evidence of Mr. Deschambault's ownership, possession and use of the iPhone based on the distinctive tattoos shown in two of the videos and the narrating voice in another. In addition, all three videos place Mr. Deshambault in the bedroom where law enforcement found cocaine and cash. In this way, the videos

are evidence of the two bases for the search of the cellphone, namely the identity of the owner, possessor and user and a linkage between drug possession and perhaps trafficking and Mr. Deschambault.

Significantly, for purposes of evaluating Mr. Dechambault's motions to suppress, he concedes that law enforcement was authorized to perform the search of the cellphone for evidence of drug trafficking. *Def.'s First Reply* at 1 ("There can be no argument that the video discussed could be lawfully seized by Agent Clark as part of his investigation into drug trafficking"); *Id.* at 2 ("No one is asserting that the executing officer(s) could not view the videos and use them to ferret out evidence of drug trafficking"); *Def.'s Supp. Resp.* at 1 ("Defendant wholeheartedly agrees that the video falls directly within the ambit of material authorized by warrant to be searched for evidence of drug trafficking, as well as identification of the Defendant as owner of the phone insofar as that might be an issue relating to alleged drug trafficking activities").

Mr. Deschambault's argument therefore is that even though law enforcement had the right to search the cellphone and the right to seize the three videos that are the subject of the motions to suppress, it could use those videos only to investigate and prove the drug charge, not to investigate and prove the sexual exploitation of a child charge.  Mr. Deschambault cites no authority for the proposition that law enforcement may not use the same legally seized evidence of one crime to investigate and prove another crime and the Court is aware of none.  For support, Defendant cites *Riley v. California*, but the Court remains unconvinced that *Riley* aids the

Defendant's claim that suppression is warranted.  In *Riley*, the Supreme Court generally required a search warrant for the search of a cellphone.

Here, law enforcement had a search warrant for Mr. Deschambault's phone. Mr. Deschambault does not challenge the state court warrant that authorized law enforcement to search the cellphone and seize evidence of drug trafficking within the cellphone.  Although Mr. Deschambault raises the particularity requirement of the Fourth Amendment, the Court has difficulty understanding how it applies here because he concedes that law enforcement officials were acting within their lawful authority when they searched the cellphone and found the three videos at issue. Here, a state judge issued a warrant that authorized law enforcement to search the cellphone for videos identifying the owner, possessor and user of the cellphone.  The videos identified Mr. Deschambault as the user of the cellphone, and therefore were directly related to one of the authorized purposes of the state warrant.  Furthermore, the videos placed Mr. Deschambault in the same bedroom where law enforcement, through another warranted search, had located cocaine and cash.  Thus, neither the warrant's issuance nor law enforcement's execution of the warrant generates the overbreadth problem that has raised judicial consternation.  *See United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1177 (9th Cir. 2010) (en banc).

As the First Circuit explained just this year in *United States v. Aboshady*, 951 F.3d 1 (1st Cir. 2020), the over-seizure concern addresses the risk that in searching electronic devices, the government will "gain access to information it has no probable cause to collect." *Id.* at 8 n.5 (quoting *Comprehensive Drug Testing*, 621 F.3d at 1177).

But, as the First Circuit observed, this concern is not present where, as here, the government had probable cause to search for the evidence it seized. *Id.*; *see United States v. Scheno*, 730 F.3d 1040 (9th Cir. 2013).

What makes this case unusual is that the evidence directly relevant to the drug trafficking investigation, namely the video showing the identity of the user and linking Mr. Deschambault to the bedroom where drugs and cash were found, is the same evidence of the new crime of sexual exploitation of a child, namely the video of Mr. Deschambault allegedly engaged in sexual activity with a minor. Thus, the concern that law enforcement will over-seize evidence in an electronic device, however legitimate elsewhere, does not apply in this case. *See Scheno*, 730 F.3d at 1042 (discussing the risk of over-seizing data because electronic devices contain "vast quantities of intermingled information").

In other words, this is not a case where law enforcement found evidence of a sex crime, such as child pornography, on a defendant's cellphone by engaging in a search unrelated to the crime that justified the initial search. Rather, in this case, videos that law enforcement lawfully found pursuant to a valid search warrant in a narcotics investigation were also potential evidence of sexual offenses. Once law enforcement had lawfully extracted these videos pursuant to the terms of the warrant, it was not a violation of the Fourth Amendment to review those same extracted videos with other law enforcement officers for the purpose of investigating additional offenses.

As previously noted, the Court is persuaded that Officer Townsend's review of the three videos at issue occurred during the lawful execution of the state search warrant. But, even if that review did not technically occur during execution of the state warrant, it was still lawful under the Fourth Amendment. Officer Townsend's review was not a search or seizure within the meaning of the Fourth Amendment. First principles of Fourth Amendment law compel this result. As the Supreme Court recently noted in *Carpenter*, "[t]he 'basic purpose of this Amendment' . . . 'is to safeguard the privacy and security of individuals against arbitrary invasions by government officials.'" *Carpenter,* 138 S. Ct. at 2213 (quoting *Camara v. Mun. Court of City and Cty. of San Francisco*, 387 U.S. 523, 528 (1967)). In modern doctrine, "the Fourth Amendment protects people, not places." *Katz v. United States*, 389 U.S. 347, 351 (1967). As a result, a search under the meaning of the Fourth Amendment occurs only when (1) the Government violates a person's subjective expectations of privacy and (2) society recognizes those expectations as objectively reasonable. *Carpenter*, 138 S. Ct. at 2213. Generally, a search is unlawful unless the Government obtains a warrant supported by probable cause. *Id.*

With this two-part test in mind, the Court now addresses whether Officer Townsend's initial review of the three videos was a search. Because the record lacks evidence of Mr. Deschambault's subjective expectations about his right to privacy in his lawfully seized iPhone and its contents, the Court assumes, without deciding, that he had such an expectation. Therefore, the Court's analysis is limited to whether society regards an expectation of privacy in lawfully seized evidence as objectively

reasonable.  Supreme Court and First Circuit precedent establishes that such an expectation (if Mr. Deschambault had it) is not reasonable.

The First Circuit's recent opinion, *United States v. Rivera-Morales*, provides a framework for the reasonable expectations analysis applicable to the facts of this case.  961 F.3d 1 (1st Cir. 2020).  In *Rivera-Morales*, the First Circuit affirmed the district court's denial of the defendant's motion to suppress evidence of defendant's production of child pornography that the defendant's wife found on his cellphone and voluntarily shared it with law enforcement.  *Id.* at 4.  To resolve whether law enforcement conducted a search which violated the Fourth Amendment, the First Circuit applied the so-called "private search doctrine."  *Id.* at 10-11.  Under this doctrine, when a private party invites law enforcement to examine evidence that the private party has found, the private party abrogated an individual's reasonable expectation of privacy in that evidence.  *Id.* at 10.  Therefore, "the government does not conduct a search when it does no more than examine particular evidence that a private party has already inspected and made available to it[.]"  *Id.*  Under these circumstances, the legally dispositive fact is whether the government's actions "'exceed the scope of the private search.'"  *Id.* (quoting *United States v. Jacobsen*, 466 U.S. 109, 115 (1984)).  Thus, there is no search when the government stays within the parameters of the private search "and, viewed objectively,  "there is 'a virtual certainty that nothing else of significance' could be revealed" . . .."  *Id.* (quoting *United States v. Powell*, 925 F.3d 1, 5 (1st Cir. 2020)).

Even though *Rivera-Morales* applied the private search doctrine, which is not at issue in this case, *Rivera-Morales* stands for the general proposition that when law enforcement comes into lawful possession of specific evidence, merely reviewing that specific evidence does not constitute a search.  Put differently, whether defendants possess an objectively reasonable expectation of privacy in evidence depends, at least in part, on how law enforcement comes upon that evidence.  Other factors that the First Circuit has found relevant to the reasonableness inquiry include:

> ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case.  We look, in short, to whether or not the individual thought of the place (or the article) as a private one, and treated it as such.

*See United States v. Almeida*, 748 F.3d 41, 47 (1st Cir. 2014) (quoting *United States v. Aguirre*, 839 F.2d 854, 856-57 (1st Cir. 1988)).

Supreme Court precedent further informs the reasonableness standard.  In *California v. Greenwood*, the Supreme Court considered whether warrantless seizure of garbage left for pickup in a home's curtilage violated the Fourth Amendment.  486 U.S. 35 (1988).  In holding it did not, the Court reasoned that because the defendants placed their trash on the curb with the understanding that strangers would take it away and could potentially inspect its contents, they harbored no reasonable expectation of privacy in the curbside trash.  *Id.* at 40-41.  Therefore, no search occurred when officers absconded with the trash.  *Id.*

Here, the record shows that Officer Townsend's review of the iPhone was confined to reviewing the three videos obtained during the execution of the state search warrant. There is no basis on which the Court can conclude Mr. Deschambault had an objectively reasonable expectation of privacy in evidence that law enforcement lawfully obtained through executing a valid warrant. Any reasonable person expects that when law enforcement seizes evidence pursuant to a search warrant, law enforcement will review that evidence for a valid law enforcement purpose. The search warrant itself abrogates an individual's reasonable expectation of privacy in the seized property. When Officer Townsend reviewed the videos, each of the *Almeida* factors quoted above weighed against finding Mr. Deschambault had a reasonable expectation of privacy in the contents of his phone. After the phone was seized pursuant to the state search warrant, Mr. Deschambault lacked possession, control, and use of the phone and no reasonable expectation that law enforcement would decline to perform a search the warrant authorized.

Based on these principles alone, the Court concludes that Mr. Deschambault's first motion to suppress must fail.

### B.   Plain View Doctrine

Another way of looking at this situation is to apply the so-called "plain view" doctrine to law enforcement's discovery of evidence of a different crime than the one that justified the search. Although the plain view doctrine has some jurisprudential antecedents, the seminal case announcing the adoption of the doctrine is the 1971 Supreme Court case of *Coolidge v. New Hampshire.* 2 WAYNE R. LAFAVE, SEARCH AND

SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 4.11(b) (5th ed. 2012) ("Any lingering doubts appear to have been dissipated by *Coolidge v. New Hampshire*") (LaFAVE).

In *Coolidge*, the Supreme Court gave as an example of a search subject to the "plain view" doctrine "the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character." 403 U.S. at 465. The *Coolidge* Court wrote that "[w]hat the 'plain view' case have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused." *Id.* at 466. The Court stated that the "doctrine serves to supplement the prior justification -- whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused -- and permits the warrantless seizure." *Id.* Finally, the Supreme Court cautioned that "[o]f course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." *Id.*

By its terms, it may not be that the plain view doctrine applies here. To fit within the doctrine, as *Coolidge* defined it, law enforcement must be legally searching for a specific object only to find "some other article of incriminating character." 403 U.S. at 465. Here, Mr. Deschambault is not objecting to the police finding "some other

article of incriminating character," he is complaining that law enforcement used an object responsive to the authorized search to investigate and charge him with a crime the warrant did not contemplate. Even so, as the Court does not know how the First Circuit will address this situation, the Court will assume the plain view doctrine could apply here and will examine the result if it does.

In *Horton v. California*, 496 U.S. 128 (1990), the Supreme Court set down the requirements for the application of the plain view doctrine. *Id.* at 136-37. First, the officer must not have violated the Fourth Amendment in "arriving at the place from which the evidence can be plainly viewed." *Id.* at 136. Second, the object must be in "plain view." *Id.* Third, the object must have an "incriminating character." *Id.* Fourth, the object's incriminating character must be "immediately apparent." *Id.* (quoting *Coolidge*, 403 U.S. at 466).[4] The First Circuit later described the plain view doctrine requirements:

> A law enforcement agent may, without a warrant, seize an object in plain view so long as he or she has (1) lawfully reached the vantage point from which he sees the object, (2) has a right of access to the object itself, and (3) has probable cause to support his seizure of that object.

*United States v. Crooker*, 668 F.3d 1, 8 (1st Cir. 2013) (citing *United States v. Paneto*, 661 F.3d 709, 713 (1st Cir. 2011)).

Here, because Mr. Deschambault concedes that the state search warrant was valid for purposes of searching for evidence of drug trafficking, law enforcement has

---

[4]      The *Horton* Court repudiated another requirement in *Coolidge*, that the police must have come upon the object "inadvertently." 2 LAFAVE at § 4.11(b), (c). As noted, "inadvertent discovery" is not one of the requirements of the plain view doctrine under the First Circuit formulation. *Crooker*, 668 F.3d at 8.

met the first requirement, that the police "lawfully reached the vantage point from which [the officer] sees the object." *Id.* Law enforcement also had the "right to access the object itself" in order to demonstrate the identity of the user of the cellphone pursuant to the drug trafficking warrant. *Id.* Mr. Deschambault argues, however, that law enforcement has not met the requirement that the police had "probable cause to support his seizure of that object." *Id.* The Court turns to that issue.

In his memorandum, Mr. Deschambault maintains that the illegal nature of the evidence was not "immediately apparent" and therefore the police had no right to seize it under the plain view doctrine. *Def.'s Supp. Mem.* at 1; *Def.'s Supp. Resp.* at 2. Mr. Deschambault asserts that the female in the video "does not look anything like a child." *Id.* He also points out that law enforcement searched and seized more than one video, noting that the law enforcement officer referred to two videos of the female engaged in sexual activity with a male holding the electronic device and that there was an additional video of the same female taken around the same date. *Def.'s Resp.* at 2-3. Mr. Deschambault observes that Agent Townsend did not mention in his report that he believed the female in the videos was a minor. *Id.* at 3.

Courts have addressed the quantum of evidence necessary to meet the "immediately apparent" standard. In *Texas v. Brown*, 460 U.S. 730 (1983), a plurality opinion, the Supreme Court wrote that it "did not view the 'immediately apparent' language of *Coolidge* as establishing any requirement that the police officer 'know' that certain items are contraband or evidence of a crime." *Id.* at 741. The *Texas* Court emphasized that "[a] 'practical, nontechnical' probability that incriminating

evidence is involved is all that is required." *Id.*  The parties cited no First Circuit case and the Court is aware of none that discusses in the context of child sexual exploitation what the visual image of a potential victim must look like in order to give a law enforcement officer probable cause to investigate further.

Before discussing the caselaw that does exist on this point, the Court first notes that even in the trial context where the rules of evidence apply, the First Circuit has generally allowed lay persons without the assistance of expert testimony to determine whether a person is under the age of eighteen because it is "an assessment routinely made in day-to-day experience." *United States v. Charriez-Rolón*, 923 F.3d 45, 51 (1st Cir. 2019) (quoting *United States v. Batchu*, 724 F.3d 1, 8 (1st Cir. 2013)); *United States v. Cameron*, 762 F. Supp. 2d 152, 163-64 (D. Me. 2011), *aff'd in part, rev'd in part on other grounds*, 699 F.3d 621 (1st Cir. 2012).  This suggests that the law enforcement officers could make the same common-sense assessment of the female's age when viewing the video on Mr. Deschambault's cellphone for the purpose of the probable cause determination.

Next, the statutory definition of the crime of sexual exploitation of children, 18 U.S.C. § 2251(a), makes it illegal to "use[] . . . any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct . . . ."  The statute defines "minor" as "any person under the age of eighteen years." 18 U.S.C. § 2256(1).  It is a matter of common understanding that once people pass puberty and enter into the teenage years, particularly as they approach eighteen, their bodies often look similar to the bodies of adults.  Therefore, for Mr.

Deschambault to maintain that the victim in this case looked like an adult takes him only so far. It does not necessarily negate the reasonableness of the law enforcement officer's decision to investigate whether the person depicted in the video was under eighteen when it was produced.

With these comments, the Court addresses relevant caselaw on the "immediately apparent" standard. In *United States v. Smith*, 459 F.3d 1276 (11th Cir. 2006), an Eleventh Circuit case, while Mr. Smith was incarcerated, law enforcement obtained a search warrant to search his mother's home for evidence that his brother was involved in drug trafficking. *Id.* at1281. While performing the search pursuant to a search warrant, law enforcement came upon a lockbox and, when they opened it, they found over a thousand photographs of Mr. Smith having sex with young girls. *Id.* Law enforcement referred the photographs to the police department's sex crimes investigation unit where they were able to corroborate that many of the photographs were of a fourteen-year-old girl. *Id.*

The *Smith* Court upheld the search and seizure of the photographs in the lockbox. The Court first noted that the lockbox "could reasonably contain drugs or related paraphernalia." *Id.* at 1291. The Court focused the remaining question: "whether it was immediately apparent to the officers -- whether they had probable cause to believe -- that among what they found in the lockbox, was evidence of child pornography." *Id.* After reviewing the officers' testimony that they thought the photographs showed minors, the Eleventh Circuit noted that the officers did not need to be sex crime experts and the test is "what a 'reasonable and prudent' officer might

have perceived and inferred." *Id.*  The officer's belief that he was observing some very young girls was, in the Eleventh Circuit's view, sufficient to establish probable cause. *Id.*  "There is no rule of law which requires an officer to know with absolute certainty that all elements of a putative crime have been completed when he seizes an article which reasonably appears to be incriminating evidence." *Id.* at 1292 (quoting *United States v. Slocum*, 708 F.2d 587, 605 (11th Cir. 1983) (quoting *United States v. Woods*, 560 F.2d 660, 664 (5th Cir. 1977)) (internal quotation marks omitted)).

Here, law enforcement obtained the state search warrant that allowed them to search the cellphone on September 4, 2019. *State Search Warrant* at 2.  On September 18, 2019, pursuant to the state search warrant, law enforcement performed a search of the cellphone to look for photographs and videos that pertained to Mr. Deschambault's use of the cellphone to engage in the drug trafficking crime under investigation or that demonstrated his ownership, possession or use of the cellphone. *Id.*  During this search on September 18, 2019, law enforcement came upon the video of Mr. Deschambault engaged in sexual activity with the female. *Sept. 18, 2019 Investigative Report* at 1.  They also came upon two additional videos: one a video of a woman whom they identified as Zilphy Avery and the other a second video of Mr. Deschambault engaged in sexual activity with the same female in the first video they later identified as a minor. *Id.*  The video of Ms. Avery and the other female was narrated by a male and the second video of sexual activity also show the same tattoos visible in the first video. *Id.*  When law enforcement identified the

female in the sexual videos, she turned out to be fourteen years old.  *Sept. 23, 2019 Investigative Report* at 1.

The three videos, as described, each reveal Mr. Deschambault as the user of the iPhone.  The first and third, as described, show his distinctive tattoos as the recorder of the sexual activity and the second, which shows Ms. Avery and the alleged victim, apparently contains a recording of his voice.  The linkage among Ms. Avery, the victim, Mr. Deschambault and the cellphone is cumulative evidence that Mr. Deschambault was the owner, possessor and user of the cellphone and is within the scope of the search warrant.  Moreover, all three videos depict a person that law enforcement identified as Mr. Deschambault in the bedroom of his apartment.

Further, although the Court has not viewed any of the videos,[5] the fact that the alleged victim was only fourteen when the videos were made is strong evidence that law enforcement was accurate when it believed the female in the videos was less than eighteen years of age.

Mr. Deschambault relies heavily upon *United States v. Carey*, 172 F.3d 1268 (10th Cir. 1999), where the Tenth Circuit suppressed evidence of child pornography the police found while performing a search pursuant to a warrant for evidence of drug crimes.  In *Carey*, law enforcement was investigating a suspect for possible possession and sale of cocaine.  *Id.* at 1270.  The search warrant had authorized a search of the defendant's computers for "names, telephone numbers, ledger receipts, addresses,

---

[5]     If Mr. Deschambault believes it is important for the Court to view the three videos to properly rule on his motions to suppress, he is free to move the Court to do so, and the Court will grant the motion.  As just noted, the Court has not seen any of the videos and has relied on the written descriptions of their contents to rule on the pending motions.

and other documentary evidence pertaining to the sale and distribution of controlled substances." *Id.* Law enforcement searched the computers by using search terms such as "money, accounts, people, so forth" into the computer's explorer to find "text-based" files containing those words. This search produced no files "related to drugs." *Id.* at 1271. The *Carey* Court wrote:

> Undaunted, Detective Lewis continued to explore the directories and encountered some files he "was not familiar with." Unable to view these files on the computer he was using, he downloaded them to a disk which he placed into another computer. He then was "immediately" able to view what he later described as a "JPG file." Upon opening this file, he discovered it contained child pornography.

*Id.*

In suppressing the evidence of child pornography, the Tenth Circuit quoted the Supreme Court in *Coolidge* as saying that "the plain view doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." *Id.* at 1272 (quoting *Coolidge*, 403 U.S. at 466). The *Carey* Court explained that once the officer expanded his search of the computers beyond the scope of what was permissibly searched under the terms of the search warrant, he had "abandoned" his permissible search for drug-related evidence and looked "for more child pornography." *Id.* at 1273. The Court ruled that once the detective commenced searching for child pornography and not for drug-related evidence, his search "exceeded the scope of the warrant" and evidence from that part of the search had to be suppressed. *Id.* at 1276.

In concurrence, Judge Baldock of the Tenth Circuit presaged the situation here. *Id.* at 1276-77. Judge Baldock pointed out:

> The detective's testimony makes clear that from the time he found the first image of child pornography, he switched from his authorized search for drug-related evidence to another subject -- child pornography. At this point, the detective should have ceased his search and obtained a warrant to search the computer files for evidence of child pornography.

*Id.* at 1276.  However, Judge Baldock wrote further:

> In contrast, if the record showed that Detective Lewis had merely continued his search for drug-related evidence and, in doing so, continued to come across evidence of child pornography, I think a different result would be required. That is not what happened here, however.

*Id.* at 1277.

Judge Baldock's second scenario is what happened here.  Law enforcement came upon the videos of Mr. Deschambault engaging in sexual activity with an apparent minor and the video of Ms. Avery with the same young female while the police were searching his cellphone for evidence related to the drug trafficking warrant.

In *Carey*, the Tenth Circuit discussed *United States v. Turner*, 169 F.3d 84 (1st Cir. 1999), a 1999 First Circuit case that arrived at a similar result, albeit in the context of a consensual search.  In *Turner*, the police were investigating an attempted nighttime assault in a woman's apartment and obtained the consent of a neighbor of the victim to search his premises and personal property.  *Id.* at 85-86.  When the defendant's computer screen suddenly lit up, a detective noticed a nude woman on the screen, whose hair color resembled the hair color of the victim, and the detective then performed a search of the computer for sexual material and found evidence of child pornography.  *Id.* at 86.

In upholding the suppression of the child pornography images, the First Circuit observed that "[a] consensual search may not exceed the scope of the consent given." *Id.* at 87. The First Circuit also rejected the government's plain view argument because law enforcement had never informed the suspect when it obtained his consent that it was investigating a sexual assault and therefore the appearance of a sexual image did not justify a deeper search for sexual content. *Id.* at 88.

Both *Carey* and *Turner* support the legality of the law enforcement search in this case because the warranted search of Mr. Deschambault's cellphone was for evidence related to the drug trafficking charge when they came upon the videos of his sexual encounter with the minor female and the video of Ms. Avery and the young female, apparently narrated by Mr. Deschambault. Also, given the facts presented by the parties, the Court rejects Mr. Deschambault's contention that law enforcement did not have probable cause to believe that the female was a minor.

## C.     The Identity of the Owner, User, and Possessor of the Cellphone

The Court does not agree with Mr. Deschambault's concern expressed in his second motion to suppress that the State affidavit supporting the request for a search warrant was defective because state law enforcement did not have enough information to link the cellphone to him, thus lacking probable cause for the initial cellphone search. *Second Mot. to Suppress* at 1-3. Law enforcement had the following evidence linking the iPhone to Mr. Deschambault: (1) the iPhone was found under the passenger seat where Mr. Deschambault was sitting, (2) neither Ms. Avery nor Mr. Deschambault claimed ownership of the iPhone, (3) a second phone in the motor

vehicle displayed a message indicating the owner was Zilphy, the only other person in the stopped vehicle, leading to the inference that each person had a cellphone and the iPhone was Mr. Deschambault's, and (4) when Agent Robinson called the number that the Confidential Informant had used to contact Mr. Deschambault to arrange for the drug deal, the iPhone rang and Agent Robinson's caller id appeared on the iPhone screen.   Cumulatively, this was enough to provide a nexus between Mr. Deschambault and the iPhone sufficient to establish probable cause to search the iPhone for evidence of the identity of the owner, user, or possessor and evidence of drug trafficking.   Furthermore, given the state's burden of proof in criminal cases, it was appropriate for state law enforcement to seek information within the iPhone itself to establish Mr. Deschambault's actual ownership, use and possession of the iPhone.

### D.   The Federal Search Warrant and the Request for a *Franks* Hearing

After the August 20, 2019 arrest of Rayevon Deschambault and seizure of a silver and black iPhone from the vehicle, law enforcement obtained a state search warrant to search his apartment.   Neither the date of this search nor the search warrant is a matter of record in this case; however, Mr. Deschambault made no claim that the state search warrant of the apartment issued by Maine State District Judge Duddy was defective.   In addition to discovering what appeared to be and field tested as cocaine, and some cash, law enforcement was able to observe several distinctive aspects of the bedroom in the apartment.  *Clark Aff.* at 3-4.

On September 4, 2019, law enforcement applied for and obtained the state search warrant to search the silver and black iPhone for evidence of drug trafficking and evidence of the identity of the owner, user and possessor of the iPhone. *Id.* at 1-6; *State Search Warrant* at 1-2. The next information in the record is a report dated September 20, 2019 confirming that on September 18, 2019, Task Force Officer Townsend reviewed the results of a digital extraction from the iPhone that revealed the two sexual videos and the narrated video of Ms. Avery and the alleged victim. *Sept. 20, 2019 Investigative Report* at 1-2.

Although Mr. Deschambault correctly observes that Task Force Officer Townsend did not mention in the September 20, 2019 investigative report that the victim appeared to be a minor, *Def.'s Supp. Reply* at 3, the heading of the September 20, 2019 investigative report is in capital letters and bold print: "**CHILD VICTIM AND CHILD WITNESS INDENTITY INFORMATION**." *Sept. 20, 2019 Investigative Report* at 1. The title of the report makes it clear that law enforcement was investigating whether the female in the sexual videos was underage.

The next step in the investigation was to identify the age of the female in the videos. The next investigative report is dated September 23, 2019 and details law enforcement's efforts to identify the female and establish her age. *Sept. 23, 2019 Investigative Report* at 1-2. Law enforcement was able to confirm the age and date of birth of the person the agents thought was the female in the video and took a still photograph of the alleged victim from the third video, showed it to school resource

officers, who were able to identity the female.  *Id.*  As of September 23, 2019, law enforcement confirmed the female's name, age, and date of birth.  *Id.*

In his supplemental reply, Mr. Deschambault argues that once law enforcement observed the videos revealing the possibility of a child victim, law enforcement "should have sought a search warrant to authorize a search of Defendant's private phone for child pornography."  *Def.'s Supp. Reply* at 1.  But this is exactly what law enforcement did.  The second application for a search warrant cited 18 U.S.C. § 2251, the sexual exploitation of a child statute and the statute that is the basis for the pending indictment.  *Fed. Search Warrant App.* at 1.  After detailing the investigation, attaching still photographs from the videos, and affirming that Mr. Deschambault was twenty-four years old and the female was fourteen, Detective Townsend expressly requested authorization to perform a comprehensive forensic examination of the cellphone to search for evidence of the sexual exploitation of children.  *Id.* at 1-10.  On September 24, 2019, the magistrate judge found probable cause, granted the request for a search warrant, and allowed an extensive examination of the cellphone to search for evidence of child sexual exploitation.  *United States v. One Cellular Phone Seized Aug. 20, 2019 Following the Arrest of Rayevon Deschambault*, 2:19-mj-00129-JHR-1, *Sealed Order* at 1 (ECF No. 2) (*Fed. Search Warrant*).[6]  The parties have not presented the Court with the results of this federally-authorized forensic examination of the cellphone.

---

[6]      The parties did not file the magistrate judge's September 24, 2019 search warrant but the warrant is a matter of public record and the Court considered it.  *See United States v. One Cellular Phone Seized Aug. 20, 2019 Following the Arrest of Rayevon Deschambault*, 2:19-mj-00129-JHR-1, *Sealed Order* (ECF No. 2).

In Mr. Deschambault's motion, he requests a so-called *Franks* hearing to explore asserted misstatements in the affidavit for a federal search warrant. *Def.'s Third Mot.* at 2-4. Under First Circuit law, "[a] defendant who seeks a *Franks* hearing to suppress evidence obtained through an invalid warrant must make two showings." *United States v. Silva*, 742, F.3d 1, 8 (1st Cir. 2014). "First, the defendant must show that the warrant application included a 'false statement or omission . . . [that] was made knowingly and intentionally or with reckless disregard for the truth.'" *Id.* (quoting *United States v. Rigaud*, 684 F.3d 169, 173 (1st Cir. 2012)). On this point, an "omission of a material fact is sufficient to trigger a hearing." *Id.* Second, "a defendant must show that the identified falsehood or omission 'was necessary to the finding of probable cause.'" *Id.* (citing *Rignaud*, 684 F.3d at 173).

Before analyzing the request for a *Franks* hearing on its merits, the Court observes that it may not matter for two reasons. First, because evidence of the three videos may be legally valid if, as the Court concluded, law enforcement was justified searching for and seizing the videos under the terms of the first state warrant. Second, as the Court concluded, law enforcement was justified seizing the same videos under the plain view doctrine. Thus, if either or both of the Court's two conclusions are correct, the Government lawfully obtained the contested evidence independently of the federal warrant. Therefore, even if the Defendant were able to invalidate the federal warrant under *Franks*, suppression of the three videos would be legally improper because there are two independent sources by which law enforcement discovered the videos in issue. *See United States v. Soto*, 799 F.3d 68,

81-82 (2015) (noting the exclusionary rule does not exclude illegally obtained evidence when law enforcement obtains the same evidence through lawful means).

Turning to the merits of his motion, Mr. Deschambault claims that the agent made the following misrepresentations and omissions in Agent Townsend's affidavit in support of the federal search warrant:

1) That he observed the video involving the alleged victim "[d]uring the course of executing a state search warrant."

Mr. Deschambault contends that this statement is false because Officer Townsend was not involved in this case until after the state search warrant had been executed. *Def.'s Third Mot.* at 2. Mr. Deschambault says that the drug investigation was over and that the focus of the investigation had turned to whether he had engaged in the sexual exploitation of a child. *Id.* Therefore, he contends that the agent's statement that he was involved in the execution of the state search warrant gives a misimpression that the affiant was involved from the outset in the investigation of Mr. Deschambault. *Id.*

2) That the female in the videos was a victim.

Mr. Deschambault asserts that Officer Townsend could not have described the female as a victim because, when he first viewed the video, the investigation had not progressed to the point where law enforcement had positively identified the female. *Id.*

3) That "Victim 1 is a person known to me."

42

Mr. Deschambault argues that Officer Townsend did not "immediately recognize" the victim and therefore the statement is false. *Id.* at 3.

4)  The mother of the female in the video is "another person known to me."

Again, Mr. Deschambault contends that Officer Townsend did not recognize the mother of the victim when he first looked at the video.

5)  The Townsend search warrant affidavit should have revealed more detail concerning the law enforcement investigation.

Mr. Deschambault posits that if Officer Townsend had revealed the truth, the magistrate judge may have asked: "*You have already searched the videos, and you already used the fruits of those searches to conduct further investigation establishing the girl's identity and age, what more do you need a search warrant for?*" *Id.* (emphasis in *Def.'s Third Mot.*).  In his third Reply, Mr. Deschambault explains that the "agent phrased statements the way he did to conceal that all the searching that the warrant was designed to allow had already taken place." *Def.'s Third Reply* at 1. He maintains that the Government is attempting to "use the existence of the Federal Warrant as cover for the illegal actions of its agent prior to the issuance of the Federal Warrant." *Id.* at 2.

The Court disagrees with Mr. Deschambault that the Townsend search warrant affidavit was misleading or requires a *Franks* hearing.  First, contrary to Mr. Deschambault's contentions, it is clear from the affidavit that law enforcement had already conducted a search of the iPhone because Agent Townsend stated that he viewed the images pursuant to the execution of a search warrant for evidence of

drug trafficking authorized by a state judge. *Fed. Search Warrant App.* ¶ 7. In the search warrant affidavit, Agent Townsend described the two videos that showed sexual activity between Mr. Deschambault and the victim, stated the date each video was apparently taken, and attached two still images from the videos. *Id.* ¶¶ 7-8. Agent Townsend also described what he did to confirm that the male in the videos was Rayeveon Deschambault, namely comparing the tattoos on his arms to the police photograph of Mr. Deschambault. *Id.* ¶ 9. He informed the magistrate judge that he had consulted with Special Agent Austin Clark and learned that the location of the sexual activity was consistent with Special Agent Clark's memory of Mr. Deschambault's bedroom. *Id.* Agent Townsend also described how he confirmed the victim's age through discussions with the victim's mother and a school resource officer. *Id.* ¶ 10. In short, a fair reading of the search warrant affidavit reveals exactly the information that Mr. Deschambault claims is missing and further confirms the magistrate judge had enough information to have posed the question that Mr. Deschambault says the magistrate judge could have asked about the need for the search warrant.

Having determined that the search warrant affidavit is not generally misleading, the Court turns to Mr. Deschambault's specific objections. First, the Court does not view as misleading the statement that Task Force Officer Townsend observed the video "[d]uring the course of executing a state search warrant." The execution of the state search warrant for examination of the cellphone for evidence of drug trafficking and the identity of the owner, user and possessor did not involve a

physical visit to a place, such as law enforcement did when they searched Mr. Deschambault's apartment.  Instead, it involved an examination of the contents of the cellphone itself.  For one officer to call in another during the search of a cellphone pursuant to a warrant does not mean that the authorized search has been terminated.

It is evident from the affidavit that law enforcement viewed the videos as part of its search of the cellphone pursuant to the state search warrant focused on drug trafficking.  *Id.* ¶ 7.  Officer Townsend expressly informed the magistrate judge that the search warrant that had authorized the viewing of the videos had "permitted a search of the Target Phone for evidence of drug trafficking."  *Id.*  Task Force Officer Townsend informed the magistrate judge that he had been assigned to work on sex trafficking investigations.  *Id.* ¶ 1.  Once Task Force Officer Townsend observed the videos, he then began a preliminary investigation, which is outlined in his affidavit, to confirm the age of the female and the identity of the male.  *Id.* ¶¶ 9-10.  The fact that the investigation had branched into an investigation of Mr. Deschambault for sexual exploitation of a child, based on the videos that had been discovered during the execution of the search warrant for drug trafficking is obvious from the Townsend affidavit and, in fact, is the reason for the search warrant application.

As for Mr. Deschambault's claim that the age of the female had not been sufficiently established to characterize her as a victim, the Court disagrees.  By the time Task Force Officer Townsend had completed the search warrant affidavit, he had been able to confirm the age of the female in the sexual videos and that she was only fourteen.  He had also been able to confirm Mr. Deschambault's age at twenty-

four.  In these circumstances, the Court finds that Task Force Officer Townsend properly described the female as a victim.

Mr. Deschambault claim about whether the victim and her mother were known to Task Force Officer Townsend is not convincing.  Task Force Officer Townsend did not say that he knew the victim and her mother, but rather that they were known to him in the sense that he is familiar with both the victim and her mother.  Furthermore, from reading a heavily redacted investigative report, it appears that the day before Task Force Officer Townsend signed the affidavit, he had met with the victim and her mother, so he properly represented to the magistrate judge that both the mother and the victim were known to him.  *Second Sept. 23, 2019 Investigative Report* at 1.  The Court disagrees with Mr. Deschambault that a magistrate judge would be misled by the phrase to conclude that Task Force Officer Townsend would have known the victim and the mother when he first looked at the videos.

The Court agrees with Mr. Deschambault that the federal search warrant application represented a change in this part of the federal investigation from drugs to child sexual exploitation.  The warrant application noted that the crime being investigated was the sexual exploitation of children, not one child.  *Fed. Search Warrant App.* at 1.  The request was to allow the seizure of the videos that law enforcement had already searched and to allow a thorough search of the cellphone for evidence of the sexual exploitation of children, including text messages, pictures and call logs. *Fed. Search Warrant*, Attach. 2, "Items to be seized" at 1.  The Court views the federal warrant as authorizing the forensic extraction of the three videos from

46

the cellphone and a search aimed not at drugs, but at any evidence of child exploitation. It was the turn in the investigation that prompted law enforcement to seek and obtain a federal search warrant allowing law enforcement to search the cellphone in a manner consistent with a crime of child exploitation, not drug trafficking, and in seeking the warrant, law enforcement was acted prudently and cautiously to make certain that searches unrelated to drug trafficking were authorized.

In summary, the Court does not view Mr. Deschambault's objections to the Townsend affidavit as pointing to misleading or false representations nor does the Court find that Mr. Deschambault has generated sufficient doubt about the accuracy of the Townsend affidavit to justify a *Franks* hearing.

## V.   CONCLUSION

The Court DENIES Rayeveon Deschambault's Motion to Suppress (ECF No. 40), Motion to Suppress II (ECF No.41), and Motion to Suppress and Request for Franks Hearing (ECF No. 42).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR
UNITED STATES DISTRICT JUDGE

Dated this 21st day of September, 2020