UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:19-cr-00187-JAW-1 |
| | ) | |
| RAYEVON DESCHAMBAULT | ) | |

## ORDER ON MOTION FOR RECONSIDERATION ON MOTIONS TO SUPPRESS

The Court denies Rayevon Deschambault's motion for reconsideration of his motions to suppress. The Court, in an effort to afford Mr. Deschambault his full due process rights, held an evidentiary hearing for fact finding on law enforcement's discovery and investigation of the cellphone video evidence. Mr. Deschambault had the opportunity to cross examine Agent Clark and Officer Townsend regarding the grounds for and execution of the state and federal warrants at issue in this case and to reargue the merits of his motion to suppress. The Court is not convinced to reconsider its earlier assessment that law enforcement discovered the videos pursuant to a warranted search of Mr. Deschambault's cellphone, in furtherance of a drug trafficking investigation, and that any delays or investigatory steps taken prior to the issuance of a second federal warrant do not merit suppression of the video evidence.

## I.   BACKGROUND

### A.   Procedural History

On October 11, 2019, a federal grand jury returned an indictment charging Rayevon Deschambault with two counts of sexual exploitation of a child, alleged

violations of 18 U.S.C. § 2251(a). *Indictment* (ECF No. 1). On February 21, 2020, Mr. Deschambault filed three motions to suppress; the last motion to suppress included a request for a Franks[1] hearing. *Mot. to Suppress* (ECF No. 40) (*Def.'s First Mot.*); *Mot. to Suppress II* (ECF No. 41) (*Def.'s Second Mot.*); *Mot. to Suppress and Req. for Franks Hr'g* (ECF No. 42) (*Def.'s Third Mot.*). The Government filed a consolidated response to these motions on April 27, 2020. *Gov't's Resp. to Def.'s Mots. to Suppress and Req. for a Franks Hr'g* (ECF No. 49) (*Gov't's Opp'n*). Mr. Deschambault filed replies on May 11, 2020. *Reply Re: Mot. to Suppress* (ECF No. 51) (*Def.'s First Reply*); *Reply Re: Mot. to Suppress and Req. for Franks Hr'g* (ECF No. 52) (*Def.'s Third Reply*).

The Court ordered the parties to address by supplemental memoranda the applicability of the plain view doctrine to Mr. Deschambault's motions to suppress. *Order for Further Briefing* (ECF No. 55). The Government and Mr. Deschambault filed supplemental memoranda on August 3, 2020, *Gov't's Br. on the Applicability of the Plain View Doctrine* (ECF No. 56) (*Gov't's Supp. Mem.*); *Supp. Mem. Re: Mots. to Suppress* (ECF No. 57) (*Def.'s Supp. Mem.*), and responses on August 10, 2020. *Gov't's Mem. in Resp. to Def.'s Br.* (ECF No. 58) (*Gov't's Supp. Resp.*); *Resp. Re: Plan View / Mots. to Suppress* (ECF No. 59) (*Def.'s Supp. Resp.*).

On September 21, 2020, the Court denied Mr. Deschambault's three motions to suppress without holding an evidentiary or *Franks* hearing. *Order on Mot. for Franks Hr'g and Mots. to Suppress* (ECF No. 60) (*Order on Mots. to Suppress*). On September 29, 2020, Mr. Deschambault moved for reconsideration of the Court's

---

[1]   *Franks v. Delaware*, 438 U.S. 154 (1978).

order denying his motions to suppress. *Resp. to Ct. Order on Def.'s Mots. to Suppress* (ECF No. 62). Mr. Deschambault requested that the Court review the cellphone videotapes that are the subject of his motion to suppress. *Id.* He further requested a hearing so that he may develop the record regarding the issuance and execution of the state and federal warrants. *Id.* The Court agreed to view the three videos and, after doing so, issued an order on January 5, 2021 deferring final ruling on Mr. Deschambault's motion for reconsideration. *Order on Mot. for Recons.* (ECF No. 75) (*Recons. Order*).

On February 9, 2021, Rayevon Deschambault moved for an evidentiary hearing on his motion to suppress and *Franks* hearing. *Mot. for Hr'g* (ECF No. 80). Mr. Deschambault specifically sought fact-finding on: (1) the alleged delays between Mr. Deschambault's arrest, the execution of the state warrant for the cellphone, and law enforcement's securing of the federal warrant; (2) the applicability of the plain-view doctrine to this case; (3) Defendant's assertion that "the Government waived . . . any reliance upon the third 'non-sexual' video" and the relevancy of that third video; (4) an "actual lack of searching or investigation subsequent to securing the Federal warrant"; and (5) to elicit further information on law enforcement reports produced during the investigation. *Id.* at 2-3. On March 2, 2021, the Government filed its response. *Gov't's Resp. to Def.'s Mot. for Franks Hr'g* (ECF No. 81). On March 8, 2021, Mr. Deschambault filed a reply. *Reply Re: Def.'s Mot. for Hr'g* (ECF No. 83).

On March 15, 2021, the Court granted Mr. Deschambault's motion for a hearing on the motions to suppress to "explore the delay between August 20, 2019

and the federal search warrant of September 24, 2019, the application of the 'plain view' doctrine to these facts, the asserted lack of a search or investigation following the issuance of the federal warrant, and other issues." *Order on Mot. for Suppression and Franks Hr'g and Oral Argument* at 2 (ECF No. 85).  In doing so, the Court reminded the parties that "application of the plain view doctrine to [Mr. Deschambault's] motions to suppress is an alternative and secondary issue." *Id.* at 3.  The Court emphasized that it denied Mr. Deschambault's previous motions primarily upon concluding that "law enforcement came upon these videos while performing a warranted search of Mr. Deschambault's cellphone and the sexual nature of two of the videos did not prevent them from using the videos to further investigate facts relevant to the drug investigation." *Id.*  The Court denied Mr. Deschambault's request for a *Franks* hearing.  *Id.*

On July 9, 2021, the Court held an evidentiary hearing on Mr. Deschambault's motions to suppress, at which Agent Austin Clark of the Maine Drug Enforcement Agency and Federal Bureau of Investigation (FBI) Task Force Officer Daniel Townsend testified.  *See Tr. of Proceedings* (ECF No. 98) (*Hr'g Tr.*).  On August 8, 2021, Mr. Deschambault filed his post-hearing memorandum.  *Post-Hr'g Mem. in Support of Mot. to Suppress* (ECF No. 99) (*Def.'s Post-Hr'g Mem.*).  On September 3, 2021, the Government responded in opposition.  *Gov't Post-Hr'g Mem.* (ECF No. 100).  Mr. Deschambault declined to file a reply.  On September 22, 2021, a grand jury returned a superseding indictment in this case charging Mr. Deschambault with a new third count of possession of material containing child pornography, in violation

4

of 18 U.S.C. §§ 225A(a)(5)(B), (b)(2) and 18 U.S.C. §2256(8)(A). *Superseding Indictment* (ECF No. 103). Also on September 22, 2021, a grand jury returned an indictment charging Mr. Deschambault with one count of distribution of cocaine base and one count of conspiracy to distribute and possession with intent to distribute cocaine base, alleging a conspiracy with Zilphy Avery, in violation of 18 U.S.C. §§ 841(a)(1) and 846. *United States v. Rayevon Deschambault*, No. 2:21-cr-00146-JAW, *Indictment* (ECF No. 1).

## II.     THE PARTIES' POSITIONS

### A.     Rayevon Deschambault's Motions

#### 1.     The First Motion to Suppress

Alleging that law enforcement performed an illegal warrantless search of his cellphone in violation of the Fourth Amendment of the United States Constitution, Mr. Deschambault moves this Court to suppress the images and videos that law enforcement obtained while reviewing the iPhone's contents before obtaining a federal warrant. *Def.'s First Mot.* at 1. Citing *Riley v. California*, 573 U.S. 373 (2014), Mr. Deschambault observes that the United States Supreme Court held that cellphones may not be searched unless law enforcement obtains a search warrant. *Id.* at 2-3. Mr. Deschambault says that because the state warrant limited the cellphone search to evidence of drug trafficking, law enforcement should not have searched the cellphone for evidence of another crime beyond the specific terms of the state warrant. *Id.* Mr. Deschambault contends that this search violated the Fourth Amendment and the results of the search must be suppressed. *Id.*

5

### 2.    The Second Motion to Suppress

In his second motion to suppress, Mr. Deschambault again refers to *Riley* for the proposition that the United States Supreme Court has ruled that cellphones are protected by the Fourth Amendment and that the search warrant requirement applies to law enforcement's search of his cellphone. *Def.'s Second Mot.* at 2. Mr. Deschambault argues that Agent Clark's affidavit did not specifically tie Mr. Deschambault to the property to be searched and therefore, in his view, it was "legally insufficient in probable cause." *Id.* Mr. Deschambault states that "there could be no Good Faith reliance upon this warrant." *Id.* He claims that the warrant was "so deficient" that "apparently at the Magistrate's urging, a handwritten paragraph 16 was added to the affidavit trying to connect the phone to the Defendant." *Id.* Mr. Deschambault argues that despite this additional paragraph, "there is no reliable or conclusive evidence offered establishing Defendant's ownership of this phone sufficient to establish probable cause." *Id.*

### 3.    The Third Motion to Suppress

Mr. Deschambault's third motion to suppress focuses on the federal search warrant. *Def.'s Third Mot.* He asks the Court to suppress all related evidence because the search was "based upon an affidavit which contained material false and misleading statements as well as omissions which, if excised from the affidavit for the warrant, would leave said warrant fatally defective in probable cause." *Id.* at 1. Furthermore, Mr. Deschambault argues that Agent Townsend improperly sought authorization for searches that he had already "extensively" completed. *Id.*

Mr. Deschambault points to Agent Townsend's statement in his affidavit that "'during the course of executing' a State search warrant, 'I observed' video depictions of Defendant engaged in sexual activities with 'Victim One.'" *Id.* at 2. "In actuality," according to Mr. Deschambault, "the Search warrant had been fully executed prior to any involvement of Agent Townsend, and therefore his statements that the sexual videos were observed by himself during the execution of the State warrant [were] false." *Id.* Mr. Deschambault urges that "[i]t cannot ever be persuasively advanced that Townsend was part of a further execution of the State warrant, since as soon as the search ceased to be focused on evidence of drug trafficking and began to be focused on sexual offenses the search was outside any legal parameters of the State warrant." *Id.*

Mr. Deschambault further disputes Officer Townsend's characterization of the female in the video as a "victim" before she was definitively identified. *Id.* Mr. Deschambault argues that Officer Townsend's statement that "Victim 1 is a person known to me" suggests that he immediately identified her upon his initial viewing of the videos, and is thus "so significantly misleading that an intent can be presumed to misinform the Magistrate Judge." *Id.* at 3. Mr. Deschambault argues that the victim and her mother were not "known to" Officer Townsend until he took multiple investigatory steps and conferred with other members of law enforcement, and that the affidavit is defective as Townsend "refrained from informing the Court that he had in fact taken so many investigative steps to determine the identities." *Id.*

7

Mr. Deschambault contends that the Magistrate Judge may have questioned the very grounds for a warrant if "told the truth" that Officer Townsend "had already fully searched these videos and extracted still photographs from them, and had reached out to various law enforcement individuals to determine the identity and then the age of the victim." *Id.* Mr. Deschambault cites *Riley*, *Carpenter* and *Franks*, and concludes by requesting a *Franks* hearing for factfinding on the allegedly false or misleading statements, or material omissions, in the affidavit for a federal search warrant.[2]

### 4.    Post-Evidentiary Hearing Memorandum

Mr. Deschambault first challenges "whether agents could permissibly use images seized for evidence concerning drug trafficking to launch an independent investigation for sexual exploitation." *Def.'s Post-Hr'g Mem*. at 1.  He reasons that "all the investigation that was necessary to bring the current charge was completed prior to applying for the Federal warrant." *Id.* Mr. Deschambault asserts that Officer Townsend's testimony "presented no persuasive rationale" for the information in the federal affidavit that he maintains is "misleading or false." *Id.* Mr. Deschambault insists that "[w]hile the State warrant allowed for continuing investigation, that investigation is tethered to the purposes of the issued warrant." *Id.* Mr. Deschambault reasons that "[i]f [the seized videos] gave rise to probable cause concerning different criminal conduct then a new warrant should have been

---

[2]     The Court denied Mr. Deschambault's request for a *Franks* hearing.  Mr. Deschambault has not provided the Court with a basis for it to reconsider that determination in this Order.  *See Order on Mot. to Suppress and Franks Hr'g* (ECF No. 60) (finding that Mr. Deschambault had not generated sufficient doubt as to the accuracy of the Townsend affidavit to justify a *Franks* hearing).

immediately secured." *Id.* at 2.  He maintains that "[u]se of the seized material to conduct an independent wide-ranging investigation into wholly dissimilar criminal conduct violates the letter and spirit of the Fourth Amendment." *Id.*

Next, Mr. Deschambault addresses his earlier express concession[3] as to the legality of the initial video seizure pursuant to the state warrant, stating that "subsequent consideration largely based on new caselaw has shown that these concessions were not warranted." *Id.*  He references his initial filings' "claim that the State warrant was insufficient in probable cause." *Id.*  Mr. Deschambault urges the Court, in its discretion, to consider this issue and examine the state warrant affidavit. *Id.*

Mr. Deschambault's memorandum relies heavily on *United States v. Morton*, 984 F.3d 421 (5th Cir. 2021).  *Id.* at 3.  He acknowledges that *Morton* was vacated pending en banc review by the Court of Appeals for the Fifth Circuit but nonetheless submits that "the rationale of the decision," which interprets *Riley v. California*, 573 U.S. 373 (2014) and other circuit opinions regarding cellphone searches, "is compelling." *Id.*  Mr. Deschambault quotes *Morton* at length to argue that cellphone warrants must specify a specific content type or storage location, in addition to the subject matter of evidence sought, concluding that "[h]ere there is absolutely no recitation of probable cause in the affidavit concerning video evidence and a connection to drug trafficking." *Id.* at 5.  He offers Agent Clark's testimony that the

---

[3]     At the evidentiary hearing, Mr. Deschambault's counsel explained that he "was meaning to say that the warrant did issue and allow for seizure of the photographs and the videos," but his "language went beyond that and seemingly waived [a challenge to the state warrant]." *Hr'g Tr.* at 47:23-48:2.

facts of the affidavit for the state search warrant did "'not specifically'" reference photos or videos relating to drug trafficking in the recitation of probable cause. *Id.* (quoting *Hr'g Tr.* at 16:3-11). Acknowledging that the affidavit did specifically "request to seek evidence concerning ownership/possession of the cell phone," Mr. Deschambault insists that "this need is belied by the testimony of Officer Clark" confirming that law enforcement suspected the phone in question belonged to Mr. Deschambault upon the initial seizure. *Id.* at 5-6 (quoting *Hr'g Tr.* at 16:19-21). Mr. Deschambault maintains that "a separate paragraph 16 was added to the affidavit at some point prior to the affidavit being signed which went directly toward Defendant's possessory connection with the cellphone." *Id.* at 6.

Mr. Deschambault next argues that "[w]hile there actually was some evidence from the videos that speaks to ownership and possession," such evidence "is no doubt dwarfed by more typical indices of ownership and possession contained within the phone, such as text messages, call records, emails, and the usual saved documents." *Id.* Citing law enforcement's "lack of need for this evidence," Mr. Deschambault reasons that authorization to search "'any data stored therein' . . . would constitute a general warrant without the particularity required by the Fourth Amendment" if used "to justify searching the phone for anything," regardless of its connection to the drug trafficking investigation. *Id.* He submits that "video evidence is *never mentioned* in the affidavit relating to either drug dealing or ownership of the phone" and that the affidavit also lacks "any claim . . . that probable cause existed that video evidence would lead to identifying information." *Id.* (emphasis in original). Mr.

Deschambault concludes that the "seizure and analysis of the video evidence from Defendant's phone was wholly unsupported by a showing of probable cause" and that the ensuing sexual exploitation investigation "took place wholly in the absence of a Federal warrant justifying that investigation." *Id.* at 7. Mr. Deschambault urges that "even video evidence of direct drug dealing must be excluded upon a lack of showing of probable cause." *Id.* Furthermore, "[a]ny potential good faith reliance upon this warrant by law enforcement was not reasonable." *Id.* (citing *Morton* 984 F.3d at 430, 431).

### B. The Government's Responses

#### 1. The First Motion to Suppress

The Government disputes the premise of Mr. Deschambault's argument: namely, his contention that the state warrant did not allow for the search that led to the discovery of the video of sexual activity. *Gov't's Opp'n* at 4. To the contrary, the Government says that the state search warrant expressly allowed the search of an identified iPhone and "any data stored therein." *Id.* The Government says that the warrant expressly allowed the seizure of evidence related to drug trafficking. *Id.*

According to the Government, the warrant went on to allow the search of the cellphone for "[r]ecords, documents, or data contained in portable electronic devices . . . including but not limited to graphic visual images (such as photographs, videos, and scanned images)" that related to two different areas: drug trafficking and evidence that "could demonstrate ownership, possession or use of the phone, or the data contained therein, or that identify the owner, possessor or user." *Id.*

Here, the Government defends the breadth of search warrant as "reasonable" for a court to authorize, given the amount and variety of electronic data that can be stored on a cellphone. *Id*. The Government also notes that the images of Mr. Deschambault discovered in the video identified him by his distinctive tattoos as the owner, possessor or user of the cellphone and were taken from the angle of the possessor and showed the bedroom that the Government had searched and was able to identify as his. *Id.*

### 2.    The Second Motion to Suppress

The Government next responds to Mr. Deschambault's second motion to suppress, which is based on Mr. Deschambault's assertion that the evidence did not sufficiently tie him to the cellphone to provide probable cause for the search and seizure of the cellphone. *Id*. at 5. The Government disagrees again with Mr. Deschambault's factual premise and points to several facts that it claims provided probable cause to believe that Mr. Deschambault was tied to the cellphone: (1) the cellphone was under the seat where Mr. Deschambault was sitting, (2) Agent Robinson called the cellphone number that the CI had been using to contact Mr. Deschambault and the iPhone rang as Agent Robinson's caller I.D. appeared on the iPhone screen, and (3) that the CI had made arrangements to purchase $120 worth of crack cocaine from Mr. Deschambault using the iPhone found underneath Mr. Deschambault's seat connects the iPhone to drug trafficking. *Id*. Finally, the Government observes that the other cellphone in the vehicle was connected not to Mr.

Deschambault but to the only other person in the vehicle, Zilphy Avery, making it more likely that the iPhone was connected to Mr. Deschambault.  *Id.*

### 3.    The Third Motion to Suppress

Finally, the Government responds to Mr. Deschambault's third motion to suppress and his request for a *Franks* hearing.  *Id.* at 5-6.  The Government lists five misstatements or omissions that Mr. Deschambault claims appeared in the affidavit for the federal search warrant of Mr. Deschambault's cellphone: (1) Agent Townsend's statement that he observed the videos "during the course of" his examination of the iPhone pursuant to the state search warrant; (2) his naming the minor in the video a "victim" before he knew her age; (3) his statement that Victim 1 "is known to me;" (4) his statement that he also knew the victim's mother, and (5) his omission of certain investigative steps that he took to determine the identity of the victim and her mother.  *Id.* at 6.

After reviewing the applicable law, the Government argues that Mr. Deschambault is not entitled to a *Franks* hearing because the Townsend affidavit, in the Government's view, did not include "a false statement or omission. . . that was made knowingly and intentionally or with a reckless disregard for the truth."  *Id.* at 8 (quoting *United States v. Rigaud*, 684 F.3d 169, 173 (1st Cir. 2012)).  In addition, the Government contends that any inaccuracies were minor and did not affect the determination of probable cause.  *Id.*

### 4.    Post-Evidentiary Hearing Response

The Government urges the Court to reject Mr. Deschambault's "new *Morton* argument," and to find that he has abandoned arguments in favor of suppression that remain undeveloped following the evidentiary hearing. *Gov't Post-Hr'g Mem.* at 1-2. First, the Government contends that "the testimony from the evidentiary hearing provides no reason" and "Defendant does not offer any meaningful challenge" for the Court to revisit its prior factual and legal conclusions, namely that:

> (1) the three videos at issue were properly seized under the state drug warrant as identifying the user of the device (particularly in light of the depiction of Defendant's tattoos, his voice, and/or and his place of residence); (2) the three videos were properly seized under the plain view doctrine; (3) the illicit nature of the two explicit videos was immediately apparent; (4) the federal warrant was properly sought and issued for a forensic review related to child exploitation offenses; (5) law enforcement acted prudently in seeking a second warrant after investigating the identity and age of the minor in the videos.

*Id.* at 2.

In a footnote, the Government responds to three "undeveloped arguments" in Mr. Deschambault's post-hearing memorandum. *Id.* at 2 n.1. Regarding Mr. Deschambault's suggestion that an "open question" persists regarding sanctionable statements in the federal warrant affidavit, the Government notes that the Court already determined that these allegations failed to meet the standard for a *Franks* hearing. *Id.* The Government next contends that Mr. Deschambault still "fails to identify any false or misleading statements" after the hearing and "offers nothing beyond conclusory arguments." *Id.* As to "whether agents could permissibly use images seized for evidence concerning drug trafficking to launch an independent investigation for sexual exploitation," *Def.'s Post-Hr'g Mem.* at 1, the Government

points out that Defendant still has not offered any authority for this argument, which the Court rejected in a previous order. *Gov't's Post-Hr'g Mem.* at 3 n.1 (citing *Order on Mots. to Suppress* at 21). In response to Mr. Deschambault's urging that "suppressing evidence gained from the federal warrant would not have any evidentiary impact," *Def.'s Post-Hr'g Mem.* at 1, the Government maintains that suppression is only available to remedy Fourth Amendment violations. *Gov't's Post-Hr'g Mem.* at 3 n.1 "There is no legal basis to justify suppression of evidence seized pursuant to the federal warrant" as "[l]aw enforcement acted prudently throughout this investigation." *Id.*

Next, the Government asserts that Mr. Deschambault "has repeatedly conceded the lawfulness of" the seizure and review of the videos pursuant to the state warrant. *Id.* at 3. The Government quotes the Court's September 21, 2020 order which recounted multiple occasions on which Mr. Deschambault conceded the lawfulness of the initial video seizure.[4] *Id.*

Turning to Mr. Deschambault's *Morton* argument, the Government submits that "*Morton* was wrongly decided." *Id.* at 4. The Fifth Circuit panel's creation "of a new Fourth Amendment rule for cellphone searches" narrowly defined "'places to be searched' as the categories [contacts, call logs, text messages, and photographs] it incorrectly believed officers had specifically asked to search." *Id.* (quoting *Morton* 984

---

[4]     *See Def.'s First Reply* at 1 ("There can be no argument that the video discussed could be lawfully seized by Agent Clark as part of his investigation into drug trafficking"); *id.* at 2 ("No one is asserting that the executing officer(s) could not view the videos and use them to ferret out evidence of drug trafficking); *Def.'s Supp. Resp.* at 1 ("Defendant wholeheartedly agrees that the video falls directly within the ambit of material authorized by warrant to be searched for evidence of drug trafficking, as well as identification of the Defendant as owner of the phone insofar as that might be an issue relating to alleged drug trafficking activities").

F.3d at 427).  The Government argues that the "panel's holding rests on a misreading of the warrant-affidavits' specification of 'the place to be searched' . . . (the phone) with the type of evidence sought (calls, texts, photographs)."  *Id.* at 5.   The Government submits that "[t]his factual mistake as to what 'places' the panel believed the trooper asked permission to search" prompted the *Morton* panel's erroneous "conclusion that [law enforcement] must establish separate probable cause to search each of these 'places.'"  *Id.* (citing *Morton*, 984 F.3d at 427).

The Government goes on to assert that *Morton* conflicts with the Supreme Court's *Riley* test for cellphone searches in two ways.  "First, rather than viewing cell-phones as containing separate places necessitating separate probable-cause showings, *Riley* explained that 'a cell phone collects in one place many distinct types of information[.]'"  *Id.* at 5 (quoting *Riley*, 573 U.S. at 375, 403).  "*Riley* thus suggests that if an affiant-officer demonstrates probable cause that a phone contains evidence of a specific crime, police can search the phone for that evidence—not just certain features within the phone."  *Id.*  "Second, *Riley* outright rejected the kind of distinction the *Morton* panel made between different cell-phone 'places' precisely because of its unworkability."  *Id.*  The Government emphasizes the vast array of apps, information, and media that can be stored on a single cellphone, quoting the *Riley* Court's observation that "'officers would not always be able to discern in advance what information would be found where.'"  *Id.* at 6 (quoting *Riley*, 573 U.S. at 399).  The Government notes that the Fifth Circuit panel "dispensed with the good-

faith exception in just two paragraphs" before it "reversed the district court's good-faith determination and vacated Morton's conviction." *Id.* at 4.

The Government further submits that *Morton* conflicts with the decisions of other circuit courts of appeals. *Id.* at 6. The Government recounts the traditional Fourth Amendment rule limiting the permissible scope of a search to only where law enforcement has probable cause to believe the object of the search might be found. *Id.* The Government points to the Tenth Circuit's acknowledgement that this rule "'is less effective in the electronic-search context where searches confront . . . the needle in a haystack problem,' i.e., knowing, without looking, where the defendant would conceal evidence within the electronic device." *Id.* (quoting *United States v. Loera*, 923 F.3d 907, 916 (10th Cir. 2019)). The Government also cites the Seventh Circuit's finding that a cellphone warrant to search for evidence "'related to the offense of [d]ealing illegal drugs'" was not overly broad, under similar facts to *Morton*. *Id.* (quoting *United States v. Bishop*, 910 F.3d 335, 336 (7th Cir. 2018)). The *Bishop* Court analogized cellphone searches to a permissible search of all file cabinets in an office, where law enforcement has no way of knowing which particular drawer holds the target documents. Similarly, "[a] defendant could place pertinent information anywhere on the cell phone, and therefore there is no reasonable way for the police ex ante to limit the scope of the search besides indicating that they are looking for evidence relevant to the drug offense under investigation. Thus, when searching a cell phone, a broad warrant is permissible because 'a warrant need not be more specific than knowledge allows.'" *Id.* at 7 (citing *Bishop*, 910 F.3d at 338; *United*

*States v. Bass*, 785 F.3d 1043, 1049 (6th Cir. 2015) (finding a warrant that "set forth a substantial basis to believe such evidence existed on [the] cell phone, but [] was unclear as to the particular *format* in which the evidence existed" was not overbroad)).

Turning to the particulars of the state warrant in this case, the Government argues that "*Morton* does not mandate a different result here." *Id.* at 7. The Government recounts that the warrant named a specific iPhone, identified by description and IMEI number as "belonging to Rayevon Deschambault," as the place to be searched. *Id.* (quoting *Def.'s Second Mot.*, Attach. 2, *State Search Warrant* at 1 (*State Warrant*)). Next, the Government recites the terms of the state warrant:

> "The items to be seized include 'graphic visual images (such as photographs, videos, and scanned images) . . . that . . . a) pertain to Rayevon Deschambault's use of the portable electronic device to engage in the crime of Aggravated Trafficking in Schedule W Drugs" and b) "Demonstrate ownership, possession or use of . . . [the device] or the data contained therein, or that identify the owner, possessor or user.'"

*Id.* (quoting *State Warrant* at 2). The Government reasons that "because there was no way to know ex ante where on his phone the defendant stored evidence about his drug activity or evidence of ownership, possession, or use, it was appropriate for the police to request authority to search the whole phone for these items." *Id.* at 7-8. By its terms, "[n]othing in the warrant limited the locations within the phone where searches were authorized." *Id.* at 8.

Finally, the Government urges that "[e]ven assuming . . . that the warrant failed to comply in some way with Fourth Amendment requirements, Defendant is still not entitled to the suppression of evidence" under the good-faith exception. *Id.*

18

at 8 (citing *United States v. Leon*, 468 U.S. 897 (1984)). The Government argues that "Defendant has made no developed argument to explain why *Leon* does not apply," such as in instances:

> where (1) the magistrate was misled by information in the affidavit that the affiant knew was false or would have known was false except for a reckless disregard of the truth; (2) the issuing magistrate wholly abandoned her detached and neutral role; (3) the affidavit was so lacking in probable cause that official reliance on it was unreasonable; or (4) the warrant was facially deficient, i.e., it so failed to particularly identify the place to be searched or things to be seized that a reasonable officer could not presume it to be valid.

*Id.* (citing *United States v. Owens*, 167 F.3d 739, 745 (1st Cir. 1999)). The Government reasons that the good-faith exception is particularly applicable here as "the *Morton* reasoning upon which Defendant relies was announced after the issuance of the state search warrant." *Id.*

## III.   DISCUSSION

Following the July 9, 2021 evidentiary hearing, the Court is not convinced to reconsider its central finding that law enforcement came upon these videos lawfully while performing a specifically authorized search of Mr. Deschambault's cellphone for evidence of drug tracking, pursuant to the state warrant. The videos at issue, taken in the same bedroom where police found drugs and cash upon Mr. Deschambault's arrest, capture his distinctive tattoos and the sound of his voice and are evidence of Mr. Deschambault's ownership, possession and use of the iPhone. Furthermore, they contained information for the police to use in their efforts to determine how Mr. Deschambault and Ms. Avery's drug trafficking operation worked, and who else was involved. The fact that the videos depict sexual activity—and were

19

later found to be separately incriminating—did not prevent law enforcement from using the videos to pursue facts and follow up on open questions relevant to the drug investigation. When law enforcement learned more about the identity of a potential member of the drug conspiracy, to support a separate sex crimes investigation, they sought and obtained a new federal warrant. *See Order* (ECF No. 85) (citing *Order on Mots. to Suppress* at 20-27; *Order on Mot. for Recons.* at 7-8 (ECF No. 75)). This conclusion, without revisiting the Court's additional finding that the videos are admissible pursuant to the plain view doctrine, is sufficient to deny Mr. Deschambault's motion for reconsideration of his motions to suppress.[5]

## A. The Search Incident to Warrant

### 1. The State Warrant

#### a. Issuance of the State Warrant

Mr. Deschambault's second motion to suppress attacks Agent Clark's affidavit for (1) lacking ties or allegations regarding Mr. Deschambault's ownership of the phone, (2) insufficient probable cause for the state warrant to issue, with particular focus on paragraph sixteen of the affidavit, and (3) alleging that law enforcement otherwise had "no reliable or conclusive evidence of ownership." *Def.'s Second Mot.* at 2.

---

[5]     On January 5, 2021, the Court issued an order following its viewing of the three videos that are the subject of the motions to suppress evidence. *Order on Mot. for Reconsideration* (ECF No. 75). The Court found that the third, non-sexual video of Ms. Avery and the victim talking, "is effectively a tip," as "the victim's youthful demeanor and mannerisms in the third video supply probable cause—a fair probability—that she is under eighteen." *Id.* at 7. "[T]aken as a whole, the three videos are, in the Court's view, sufficient to fall within the immediately apparent standard under the plain view doctrine once the young person on the mattress is identified as the same female in the sexual videos." *Id.*

Law enforcement had many reasons to think that the phone belonged to Mr. Deschambault. MDEA obtained an arrest warrant for Mr. Deschambault following multiple controlled purchases by a confidential informant (CI), who communicated with Mr. Deschambault via text message in June and August of 2019. *Gov't Opp'n* at 1. During the August 20, 2019 execution of the state arrest warrant for Mr. Deschambault, MDEA seized two cellphones from inside the two-occupant vehicle. *Def.'s Second Mot.*, Attach. 1, *Affidavit of Special Agent Austin Clark of the Maine Drug Enforcement Agency* at 3 (*Clark Aff.*). One phone was found in the driver's seat where Ms. Avery had been sitting, and it displayed a message identifying its owner as "Zilphy." *Id.* The other phone was a silver and black iPhone S bearing IMEI 354957075834401. *Id.* Officers found this phone under the front passenger seat, where Mr. Deschambault had been sitting. *Id.* MDEA Special Agent Robinson called the phone number for Mr. Deschambault that the CI had used to set up the controlled purchases. *Id.* When Agent Robinson did this, the iPhone rang and displayed Agent Robinson's phone number on the caller I.D. *Id.* At the evidentiary hearing, Agent Clark confirmed that he based his affidavit statements regarding possession of the phone, in paragraphs 5 and 16, on Agent Robinson's call to a number known to be Mr. Deschambault's, upon which the phone in question rang, confirming as "[the MDEA Agents] suspected" that it was Mr. Deschambault's phone. *Hr'g Tr.* at 16:12-23.

Mr. Deschambault suggests that the final paragraph sixteen of Agent Clark's affidavit was only added at the Maine District Court Judge's urging, in an attempt to bolster an insufficient showing of probable cause. *Def.'s Second Mot.* at 2. Paragraph

sixteen reads: "Due to the fact, C.I. 5421 made arrangements to purchase $120.00 worth of cocaine base from DESCHAMBAULT in the area while communicating with DESCHAMBAULT through the phone found in the Explorer, there is probable cause to believe the iPhone contains evidence of drug trafficking." *Clark Aff.* ¶ 16. When asked about the Government's Exhibit One, Agent Clark's affidavit and request for a search warrant, and Defendant's Exhibit One, the same affidavit with an additional paragraph sixteen, Agent Clark did not recall why two different versions exist. *Hr'g Tr.* at 15:5-17. He acknowledged that paragraph sixteen is specific to probable cause to seize the cellphone. *Id.*

Agent Clark's affidavit recited sufficient facts linking Mr. Deschambault to the cellphone to support probable cause for the state warrant to issue, and  contrary to Mr. Deschambault's assertions otherwise, Agent Clark's assessment based on all these indicators that Mr. Deschambault was the phone owner did not prevent him from seeking and executing the state warrant, in part to confirm these suspicions. Finally, Agent Clark's testimony regarding paragraph sixteen did not, as Mr. Deschambault predicted it would, bolster his allegations of deficient probable cause or misstatements in the affidavit.

### b.     The Scope of the State Warrant

Mr. Deschambault's first motion to suppress asserts that the state warrant limited the scope of any search of the phone to evidence of drug trafficking only. *Def.'s First Mot.* at 3. Mr. Deschambault still does not offer specific support for this proposition of law. *See Order on Mot. for Reconsideration* at 8 (ECF No. 75) ("Once

law enforcement lawfully seizes evidence, the Court is aware of no authority that prevents law enforcement from using that evidence to investigate crimes not contemplated by the warrant"). Even if the Court were persuaded by this argument, it still disagrees with Mr. Deschambault that law enforcement's finding and reviewing of the videos strayed beyond the boundaries of the authorized search categories. *See State Warrant*. The state warrant authorized law enforcement to look for evidence of drug trafficking and for evidence confirming the identity of the phone owner, and that is exactly what Agent Clark was doing in reviewing the contents of Mr. Deschambault's phone, when he came upon the sexual videos. *Id.*

First, the video contents prompted law enforcement to investigate the unidentified female's possible role in the drug trafficking operation. Law enforcement confirmed that the videos depict the same bedroom, identified as Mr. Deschambault's, that they searched for evidence of drug trafficking. In that room, agents found a large bag of cocaine "inside a female's purse," a significant amount of cash, and another smaller bag of cocaine in a trash can. *Clark Aff.* ¶11-15. The sexual nature of the first two videos suggests some degree of closeness between the victim and Mr. Deschambault, as opposed to a situation where she happened to be videotaped while just passing through the house or only there on Ms. Avery's invitation. Moreover, the third non-explicit video links the victim to Ms. Avery, who was arrested with Mr. Deschambault, who was found with baggies of cocaine on her person during the traffic stop, and who was later indicted and has now pleaded guilty to possession with the

intent to distribute cocaine base on August 20, 2021.[6]  *See United States v. Zilphy Avery*, No. 2-21-cr-00122-JAW.  This third non-explicit video links Mr. Deschambault, Ms. Avery, and the victim all together, with narration, attributed to Mr. Deschambault, calling the bedroom a "trap house room," raising further suspicion that all three were not only linked to each other, but linked to selling drugs.  *Order on Mot. For Reconsideration* (ECF No. 75).  Young or not, filmed illicitly in a way that became grounds for a separate investigation or not, law enforcement had ample reasons to figure out who the victim was, and to investigate the nature of her participation in or knowledge of Mr. Deschambault and Ms. Avery's suspected drug trafficking.  As Officer Townsend testified, Agent Clark contacted him after coming upon the videos while "reviewing content for the furtherance of his state drug trafficking investigation."  *Hr'g Tr.* at 24:3-11.

As to the second authorized search target, the videos "[d]emonstrate ownership, possession or use" of the phone by Mr. Deschambault to record himself with the victim and with Ms. Avery, and further serve to identify him by his physical characteristics.  The three videos are set in the bedroom that law enforcement identified and searched as Mr. Deschambault's, they depict his distinctive tattoos and record the sound of his voice, and the third non-explicit video further links the victim

---

[6]    On October 14, 2021, Ms. Avery pleaded guilty to possession with the intent to distribute cocaine base.  *United States v. Avery*, 2:21-cr-00122-JAW-1, *Min. Entry* (ECF No. 29).  Although the Second Amended Prosecution Version of Ms. Avery's offense does not identify Mr. Deschambault by name, it refers to the incident on August 20, 2021 in which Ms. Avery and a "Person A" were stopped on Illsey Street in Portland, Maine.  *Second Am. Pros. Version* at 1 (ECF No. 30).

to Mr. Deschambault's alleged drug trafficking coconspirator Ms. Avery,[7] and speaks to the relationship among all three of them.

### 2. The Federal Warrant

Mr. Deschambault's third motion to suppress claims that the federal search warrant was improperly sought to begin with, reasoning that Officer Townsend had already conducted the search he sought authorization for. *Def.'s Third Mot.*, at 2. Mr. Deschambault further alleges false or misleading statements in Officer Townsend's affidavit, namely that the victim was "known to [Officer Townsend]" and Officer Townsend came across the illicit videos "during the course of executing" the state warrant. *Id.* at 2-3. Mr. Deschambault requested an evidentiary hearing, in part, for the opportunity to cross examine Officer Townsend about these allegedly false or misleading statements, and to uncover further details regarding any investigatory steps that he took prior to applying for the federal warrant. *Id.* at 4.

At the hearing, Officer Townsend testified that he wrote "the victim is a person known to me" in his affidavit because he "conducted an interview of the juvenile on September 18th [2019], and as a result her identity is known to me." *Hr'g Tr.* at 41:5-8. While he "did not recognize her the first time [he] saw the video," when he returned to her residence that same day before applying for the federal warrant, "her identity was immediately apparent to [him]." *Id.* at 43:18-44:1.

---

[7]     The drug trafficking indictment against Mr. Deschambault identifies Zilphy Avery as his alleged co-conspirator. *United States v. Rayevon Deschambault*, No. 2:21-cr-00146-JAW, *Indictment* at 1 (ECF No. 1).

He further explained that he did not detail the investigatory steps that he took to confirm the victim's identity in the affidavit in an effort "to have the video speak for itself, trying to insulate the [victim and her] cooperation with law enforcement." *Id.* at 41:16-21. As to "why [he] did not inform the magistrate that [he] had already done all of these days of investigation prior to seeking the federal warrant," Officer Townsend explained that:

> the standard was to establish probable cause, and I know who the victim was. It was -- there was no omission other than -- we reviewed the video, I spoke to the juvenile, the juvenile was known to me, and that was – those were the basic facts for the -- for the probable cause in the application."

*Id.* at 42:6-11. Officer Townsend testified that his first viewing of the videos was properly pursuant to the execution of the initial September 4, 2019 state search warrant, noting that "the search warrant authorizes law enforcement to review . . . the warrant multiple times." *Id.* at 40:8-13. Finally, Officer Townsend testified that he "[a]bsolutely [did] not" have any concerns regarding his investigatory steps prior to obtaining the federal search warrant. *Id.* at 42:12-16.

On the issue of the federal warrant, Mr. Deschambault criticizes law enforcement for obtaining the federal warrant and then says that the federal warrant was necessary. Mr. Deschambault leads off by insisting that the federal warrant was unnecessary because law enforcement already had what they needed in executing the state warrant to prosecute new child sex-related criminal conduct. *Def.'s Post-Hr'g Mem.* at 1 ("Agent Townsend testified that no evidence was gained from the execution of the Federal Search warrant. As has been argued in the past, all the investigation

that was necessary to bring the current charge was completed prior to applying for the Federal warrant"). Mr. Deschambault next argues, however, that if law enforcement suspected new criminal conduct then they should have gotten a new warrant. *Id.* at 2 ("If this material gave rise to probable cause concerning different criminal conduct then a new warrant should have been immediately secured"). While Mr. Deschambault takes issue with both options before them, law enforcement chose one and complied with it: they suspected new crimes upon receiving confirmation of the videos' incriminating nature and sought a new warrant accordingly. As the Court has emphasized in this and prior orders, the videos' content does not suggest wholly dissimilar criminal conduct than that being investigated to begin with. Efforts to identify and interview the female in the videos, irrespective of any concerns about her age, were in furtherance of the underlying drug investigation.[8] As it turned out, the videos just happened to be incriminating for other reasons.

### 3. The Delay Between the August 20, 2019 Arrest and the Federal Search Warrant of September 24, 2019

---

[8]    In its January 5, 2021 reconsideration order, having viewed the three videos, the Court accepted Mr. Deschambault's point that the sexual videos "would not prove the crime of sexual exploitation of a child without external confirmation of the age of the female." *Recons. Order* at 4. At the same time, considering the three videos together, the Court viewed the non-sexual video of the female as suggesting that she was a young teenager. *Id.* at 6 ("[T]his third video is effectively a tip, which casts the sexual videos in a different light. In the third video, the fourteen-year-old female projects much more like a fourteen-year-old girl than a young woman eighteen years old or older").

Mr. Deschambault objected to the Court's finding in part on the ground that the Government had not raised this observation. The Court is dubious that the failure of the Government to argue an interpretation of the videotape evidence restricts the Court from making its own findings based on that evidence, which it viewed at Mr. Deschambault's request.

Nevertheless, even if Mr. Deschambault's objection to the Court's finding about the third video is credited for purposes of argument, what is left is two videos of Mr. Deschambault engaged in sex with a young female of indeterminate age. Law enforcement pursuit of the identity of the female would therefore be in furtherance of its investigation of drug trafficking since, accepting for argument's sake Mr. Deschambault's objection to the third video, the two sexual videos standing alone would not provide probable cause that he was committing the crime of sexual exploitation of a minor. By the same token, immediately upon learning of the female's age, the sexual videos became evidence that Mr. Deschambault had committed that crime.

As to the alleged delays in obtaining and effecting the warrants in this case, Agent Clark testified that his analysis of the phone, pursuant to the September 4, 2019 state warrant, was "not immediate because it needed to go to the computer crimes lab." *Hr'g Tr.* at 12:22-13:5.  He explained that he waited until September 18th to meet with Officer Townsend, after the state warrant was issued on September 4th, because "[t]hat would have been the timeline to actually get into the phone, complete the search[.]" *Id.* at 17:7-22.  He testified that he first saw the videos "[i]n that time frame." *Id.*  During his initial review of the phone, Agent Clark sought information concerning the gun found in the car during the police stop but did not find anything. *Id.* at 18:13-18.  Agent Clark further testified that, after giving Officer Townsend a copy of the videos, he did not participate in Officer Townsend's investigation regarding the female's age and identity. *Id.* at 18:3-12.

On September 18, 2019, after meeting with Agent Clark, Officer Townsend "contacted a task force agent . . . from Gorham Police Department" in his efforts "to confirm the identity of the female in those three videos" because "the juvenile . . . was believed to be a resident of the town of Gorham." *Id.* at 26:11-25.  Officer Townsend shared a non-explicit screenshot with Gorham Police Department School Resource Officer Coffin who "has extensive dealings with the juvenile" and confirmed that the female in that video was the same juvenile "that the Maine drug agents had information was potentially engaged in assisting drug crimes." *Id.* at 27:3-17.  When Officer Townsend eventually met with the victim and her mother, he was able to confirm her date of birth with her mother, making her 14 years old as of the time

28

stamp of the videos, and that she was "in fact the same female observed in the three videos." *Id.* at 28:3-17.  While the purpose of that meeting was introductory, "to conduct a basic facts interview," the name "Minolo had come up," so Officer Townsend was certain that the victim "was in fact the right person that we should be talking to . . . as [Minolo] was known to be a name that Rayevon Deschambault went by around that time." *Id.* at 28:21-29:5.

A police officer "'does not avoid or delay applying for a warrant if he or she is conducting an investigation spurred by suspicion, but without, in her reasonable judgment, sufficient evidence to establish probable cause to support a warrant.'" *Howes v. Hitchcock*, 66 F. Supp. 2d 203, 213 (D. Ma. 1999) (quoting *United States v. Rengifo*, 858 F.2d 800, 804 (1st Cir. 1988)).  "Government agents cannot 'delay' or 'avoid' obtaining a warrant, however, if there is no probable cause for obtaining one." *Rengifo*, 858 F.2d at 804.  At this introductory meeting, Officer Townsend gained additional factual support for a federal warrant to proceed with his investigation. Moreover, testimony at the hearing failed to reveal bad-faith on the part of law enforcement for any delay in seeking the federal warrant, with Officer Townsend recounting, for example, that he was working on multiple investigations at the end of September 2019, during "one of the busiest times of [his] entire career."  *Hr'g Tr.* at 44:4-10.

### 4.    The Purported Lack of a Search or Investigation Following the Issuance of the Federal Warrant

In his motion requesting an evidentiary hearing, Mr. Deschambault further argued that questioning Officer Townsend as to the "actual lack of searching or

investigation subsequent to securing the Federal warrant . . . would expose the entire Federal search warrant process as a sham." *Def.'s Mot. for Hr'g* at 3. At the hearing however, Officer Townsend did mention specific investigatory steps, namely to determine whether Mr. Deschambault had disseminated the explicit videos, that law enforcement was waiting for a federal warrant to pursue. At the time, law enforcement did not know if the videos were exclusively on the cellphone, or if copies were stored elsewhere or had been distributed to other parties.

Officer Townsend testified that he sought a federal warrant in order to lawfully carry out his ongoing investigation, prior to conducting a full child forensic interview on September 27, 2019. *Hr'g Tr.* at 31:7-15, 29:14-24. His ongoing investigation needed to "confirm that the videos that we had observed were [] the same images that had been observed on September 18th." *Id.* Furthermore, law enforcement was still seeking evidence of "explicit child imagery and . . . any messages, communications, as it related to potential dissemination of the explicit child imagery." *Id.* Other FBI personnel were being brought in to investigate whether "those images had been disseminated or discussed or communicated with anyone else." *Id.* at 31:16-21. Contrary to Mr. Deschambault's prediction, Officer Townsend recounted an ongoing and expanded investigation. These next steps were taken pursuant to the federal warrant that he sought to investigate new and different criminal activity, just as Mr. Deschambault maintains he needed to do.

5. *Morton*

Mr. Deschambault's post-hearing memorandum relies heavily on *Morton* to challenge the state warrant and the initial authorization for Agent Clark's search of the phone. *Def.'s Post-Hr'g Mot.* at 3-5, 7. He reads *Morton* to insist that the state warrant should have specifically mentioned photos and videos of drug trafficking. *Id.* at 3-5. He reasons that "particularity" must be specific to how and where information is stored on a phone, not just what information is sought. *Id.*

Even if the Court were to find the Firth Circuit's vacated opinion[9] in *Morton* persuasive, as Mr. Deschambault urges it to, the facts of *Morton* are distinguishable from those of this case in several important respects. In *Morton*, law enforcement found drugs in the defendant's van but also found items consistent with a sexual interest in children and they suspected Mr. Morton of being a pedophile. *Morton*, 984 F.3d at 424. Officers observed these materials raising pedophilia concerns during an initial traffic stop, prior to seeking any warrant at all. *Id.* Law enforcement then submitted affidavits "based only on evidence of personal drug possession" for a warrant to search the defendant's cellphone for evidence of drugs. *Id.* The initial affidavits made no mention of their suspicions of crimes related to child exploitation. *Id.* When they discovered images of child pornography in executing the drug crime warrant, they then got a search warrant to search the cellphone for evidence of child exploitation and found over 19,000 images of child pornography on the cellphone. *Id.*

---

[9]        As an opinion from the Fifth Circuit, *Morton* is not, of course, binding on this District Court and, as an out of circuit opinion, is significant because of its persuasive, not stare decisis power. But even this persuasive power has been eroded because on May 18, 2021, an en banc panel of the Fifth Circuit not only granted a rehearing in *Morton* but also vacated the panel opinion dated January 5, 2021. *United States v. Morton*, 996 F.3d 754, 755 (5th Cir. 2021).

First, even if the Court adopted *Morton*'s reasoning that under *Riley*, "distinct types of information, often stored in different components of the phone, should be analyzed separately," the state warrant here did authorize a search of the type of video information that law enforcement reviewed. *See id.* at 426; *State Warrant*. Mr. Deschambault argues that law enforcement only needed to review stronger, "more typical" indices of phone ownership, like texts, emails, and calls, and would have had sufficient identifying information without looking into Mr. Deschambault's videos. The relative evidentiary value of different content types for identifying a phone's owner, however, does not limit law enforcement from carrying out their duly authorized search. Here, that authorization expressly included searching phone videos for evidence of drug trafficking activity or affiliations or further evidence confirming the identity of the phone owner or user. *Def.'s Post-Hr'g Mem.* at 6.

Second, and more importantly, unlike in *Morton*, Agent Clark did not suspect (and had no reason to suspect) Mr. Deschambault of a crime of child exploitation in seeking the initial state warrant. Law enforcement obtained a search warrant to search the cellphone for evidence of drug dealing and came upon the three videos of the female while looking for evidence of drug dealing. *Morton* emphasized the Supreme Court's observation in *Riley* that "certain types of data" on cellphones are "qualitatively different" from other types. Here, police did have probable cause for the content category that they sought to review: photos or videos in Mr. Deschambault's cellphone that would document drug trafficking activity or that

would link him to others in a trafficking conspiracy.  *See Morton*, 984 F.3d at 426
(citing *Riley*, 573 U.S. at 395).[10]

### 6.    The Videos and the Plain View Doctrine

The Court again emphasizes as that "the application of the plain view doctrine
to [Mr. Deschambault's] motions to suppress is an alternative and secondary issue."
*Order on Mot. for Suppression and Franks Hr'g* (ECF No. 85); *see Order* (ECF No. 60).

Agent Clark was the first to review the phone seized pursuant to the state
warrant and observe the videos.  *Hr'g Tr.* at 8:16-24.  During his initial review, Agent
Clark sought information concerning the gun found in the car during the police stop
but did not find anything.  *Id.* at 18:13-18.  Mr. Deschambault denied ownership of
the gun at the time of his arrest.  *Id.* at 18:19-19:5.

When Agent Clark first saw the videos, he did not recognize the female but
observed that "she appeared youthful," and that the same female "was present in all
three."  *Id.* at 9:8-25.  Agent Clark specifically based his assessment on "[f]acial
features, hair color, and just general body composition, size."  *Id.* at 19:10-16.  He
testified that "the agents that recognized her [from their awareness of her potential
involvement in drug trafficking activities] knew her age."  *Id.* at 20:17-21.  When he

---

[10]     Again, regardless of the sexual context or the youthfulness of the person depicted in the videos,
law enforcement had a right to find out who the person was so that they could find out what, if
anything, she knew about Mr. Deschambault's drug dealing.  As Officer Townsend testified, when
Agent Clark contacted him "there was general awareness that there was a -- a juvenile female . . . that
had been involved in potentially some drug crimes related to Rayevon Deschambault."  *Hr'g Tr.* at
25:3-6.  He recounted "a basic belief that that juvenile might be involved and might in fact be the
juvenile in [] the series of three videos from August 13th into August 14th of 2019."  *Id.* at 25:7-10.
When Officer Townsend identified the victim, he confirmed that she was a minor and properly sought
and obtained another search warrant to search the cellphone for evidence of child pornography.

met with Officer Townsend, "we told him who we thought she was and how old she was[.]" *Id.* at 20:14-21:2. Testimony at the hearing aligns with the Court's previous determination that "taken as a whole, the three videos are, in the Court's view, sufficient to fall within the immediately apparent standard under the plain view doctrine. . . ." *Order on Mot. for Reconsideration* at 7 (citing *Horton v. California*, 496 U.S. 128, 133 (1990)).

### 7.   The Good Faith Exception

The Government submits that even if the Court finds the state search warrant "failed to comply in some way with Fourth Amendment requirements," law enforcement relied on it in good faith. *Gov't Post-Hrg. Mem.* at 8. The Government asserts that Mr. Deschambault "has made no developed argument to explain why *Leon* does not apply" here, particularly as "the *Morton* reasoning upon which Defendant relies was announced after the issuance of the state search warrant." *Id.*

### a.   Legal Standard

It is "apodictic" that "[e]ven if a warrant issues upon an insufficient showing of probable cause, suppression may be inappropriate if the officers involved have exhibited objective good faith." *United States v. Coombs*, 857 F.3d 439, 446 (1st Cir. 2017) (quoting *United States v. Floyd*, 740 F.3d 22, 32 (1st Cir. 2014)). Known as the *Leon* good faith exception, in 1984, the Supreme Court held that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *United States v. Leon*, 468 U.S. 897, 922 (1984);

*United States v. Woodbury*, 511 F.3d 93, 99 (1st Cir. 2007) (referring to the "*Leon* good faith exception").  "This is particularly true, we believe, when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Leon*, 468 U.S. at 920.  This is consistent with the First Circuit's guidance that "[t]he exclusionary rule should be limited to those situations where its remedial objectives are best served, i.e., to deter illegal police conduct, not mistakes by judges and magistrates." *United States v. Bonner*, 808 F.2d 864, 867 (1st Cir. 1986).  The good faith inquiry should be made on a "case-by-case" basis.  *United States v. Vigeant*, 176 F.3d 565, 572 (1st Cir. 1999).

In *United States v. Levin*, 874 F.3d 316 (1st Cir. 2017), the First Circuit described the three *Leon* "bounds of the good faith exception":

1. "[I]f the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth."

2. "[W]here the issuing magistrate wholly abandoned his judicial role."

3. Where the executing officer relies "on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"

*Id.* at 322 (quoting *Leon*, 468 U.S. at 923 (citations omitted).  In *Levin*, the First Circuit referred to a fourth, noting that"[t]he *Leon* good faith exception does not apply where . . . a warrant . . . is 'so facially deficient - - i.e. in failing to particularize the place to be searched or the things to be seized- - that the executing officers cannot reasonably presume it to be valid.'"  *Id.* (quoting *Woodbury*, 511 F.3d at 99 (citing *United States v. Owens*, 167 F.3d 739, 745 (1st Cir. 1999)).

Applying these four exceptions to the facts in this case, the Court concludes that none is present here. First, Mr. Deschambault's allegations of false statements were specific to the Townsend affidavit for the federal warrant. These allegations failed to meet the standard for a *Franks* hearing as to that warrant, and Mr. Deschambault did not present new evidence of false or misleading statements in either warrant affidavit before, during, or following the evidentiary hearing. *See Def.'s Post Hrg. Mem.* at 1 (maintaining that Officer Townsend "presented no persuasive rationale" for the allegedly false or misleading statements). Second, there is no suggestion that the warrant-issuing state judge wholly abandoned their detached judicial role. Third, having reviewed the supporting affidavits and the warrants, the Court cannot conclude that the warrants were issued based on affidavits so lacking in probable cause as to render the magistrates' approvals of the search warrants unreasonable. Finally, as discussed above, the state search warrant was not so "facially deficient" that Agent Clark could not have presumed it valid. *See Woodbury*, 511 F.3d at 99.

The Court turns to Mr. Deschambault's remaining challenge to the good faith exception: that law enforcement could not have relied in good faith on the state search warrant as wholly unsupported by probable cause.

### b.      Probable Cause

Mr. Deschambault urges the Court to adopt the rationale of *Morton* to find that "seizure and analysis of the video evidence from Defendant's phone was wholly unsupported by a showing of probable cause," and thus "law enforcement could not

have reasonably relied on the state search warrant in good faith." *Def.'s Post-Hrg. Mot.* at 7. Not only is *Morton* a non-binding, vacated, out of circuit opinion, but it had not been decided in September 2019, when the state search warrant was executed. Even if the Court were to adopt the Fifth Circuit's new standard for cellphone warrant particularity, currently vacated pending en banc review, that would not undermine Agent Clark's reliance in good faith on the warrant as supported by probable cause. The state of the law at the time made reliance on the warrant objectively reasonable, and suppression in this instance would serve no deterrent purpose. *See United States v. Brunette*, 256 F.3d 14 (1st Cir. 2001) ("This exclusionary rule does not obtain . . . where an objectively reasonable law enforcement officer relied in good faith on a defective warrant because suppression in that instance would serve no deterrent purpose"). The state warrant was lawfully executed by a search within its scope for evidence of drug trafficking and of Mr. Deschambault's ownership of the phone or identity. *See Leon*, 468 U.S. at 920.

## IV.  CONCLUSION

The Court DENIES Rayevon Deschambault's Motion for Reconsideration (ECF No. 62) of his Motion to Suppress (ECF No. 40), Motion to Suppress II (ECF No. 41), and Motion to Suppress and Request for a *Franks* Hearing (ECF No. 42).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 21st day of October, 2021

37